SUGARLAND INDUSTRIES, INC., Defendant, Appellant,

and

United States National Bank of Galveston, Trustee, Intervenor, Appellant,

v.

Lyda Ann Q. THOMAS et al., Plaintiffs, Appellees.

Supreme Court of Delaware.

Submitted Nov. 13, 1979.

Decided May 29, 1980.

Charles F. Richards, Jr., Allen M. Terrell, Jr. and Donald A. Bussard of Richards, Layton & Finger, Robert K. Payson of Potter, Anderson & Corroon, Wilmington, for defendant–appellant.

Bruce M. Stargatt and Jack B. Jacobs, of Young, Conaway, Stargatt & Taylor, Wilmington, for intervenor–appellant.

James M. Tunnell, Jr., Andrew B. Kirkpatrick, Jr., Richard L. Sutton and William T. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiffs–appellees.

Before DUFFY, QUILLEN and HORSEY, JJ.

DUFFY, Justice:

This is an appeal from an order of the Court of Chancery awarding $3.5 million in attorney fees. Counsel's efforts in the case are separable into two phases, and the appeal places both of them in issue, that is, a Phase I award of $3 million and a Phase II award of $500,000. Plaintiffs have cross–appealed as to the orders governing interest on the awards.

I

The relevant facts are as follows:

In January 1973, Sugarland Industries, Inc., a Delaware corporation (defendant)

controlled by the Kempner family,[1] owned 7,500 acres of land in Texas south of Houston which it was attempting to sell. Lyda Ann Q. Thomas and her husband, J. Redmond Thomas (plaintiffs), who are members of the Kempner family and shareholders in Sugarland, were concerned about a proposed sale of the so–called South Tract (which is the major part of the property and includes some 5,900 acres) to White and Hill, a Texas partnership involved in real estate development, for $23,800,000. Plaintiffs considered the price to be inadequate and retained Brantly Harris, a Houston lawyer and a partner in the firm of Prappas, Caldwell & Moncure (now, Prappas, Moncure, Harris & Termini) to represent their interest in the proposed sale. Shortly thereafter, and at least partially as a result of Mr. Harris' efforts, a syndicate known as R–S–C was formed and it offered to buy the South Tract for $27,000,000, or $3.2 million more than White and Hill had offered.

Ignoring the higher bid by R–S–C, Sugarland's directors continued to favor White and Hill and gave notice that a special meeting of stockholders would be held on March 7, 1973, to consider and accept the $23.8 million proposal. After being informed of such a meeting, the Prappas firm, concerned that the Sugarland directors had excluded the possibility of selling the property to anyone other than White and Hill, consulted counsel in Delaware about litigation to block the sale. Prappas had suggested to R–S–C that it would be helpful if R–S–C, which would benefit if plaintiffs prevailed in such litigation, advanced $10,000 as a retainer for Delaware counsel; under this plan, plaintiffs would pay any fees in excess of the $10,000. Both R–S–C and plaintiffs agreed to that arrangement.

Shortly thereafter, on March 6, plaintiffs filed a stockholders' derivative action in the Court of Chancery to enjoin the proposed sale of the South Tract to White and Hill.

On March 9, Mr. Prappas wrote a letter to the Thomases confirming their fee arrangement with his firm. The letter stated in part, as follows:

"We wish this memorandum to confirm our understanding concerning the payment of fees and expenses in the above captioned cause to our firm and the firm of Morris, Nichols, Arsht & Tunnell of Wilmington, Delaware.

Both firms will act as counsel for you to prosecute the cause of action as set forth in the complaint filed on March 6, 1973. As we previously advised you, our minimum hourly rates are $55 per hour for partners and $35 per hour for associates. Mr. Andrew B. Kirkpatrick, Jr. of the firm of Morris, Nichols, Arsht & Tunnell has advised us that their firm's minimum hourly rates are $75 per hour for partners and $30 to $40 per hour for associates. As we advised you on Sunday, March 4, 1973, Messrs. Ron Mafrige, Fred Rizk and the principal partners of Shindler/Cummins, Inc. have agreed to contribute a total of $10,000 toward the cost of this litigation.

In connection with this employment, both our firm and the firm of Morris, Nichols, Arsht & Tunnell shall have the right to petition the Court for the allowance of attorney's fees and expenses, and the minimum hourly rates set forth herein shall not preclude either firm from petitioning the Court for allowance of attorney's fees predicated upon the time involved, the number and complexity of legal issues involved and the results accomplished for the benefit of all the shareholders of Sugarland Industries, Inc. As we have advised you, it shall be the practice of both firms to periodically bill you for time and charges expended through the period of billing and each of you shall be individually and personally responsible to both firms for the payment of our fees and expenses in excess of $10,000, which will be contributed by

---

1. All members of the Board of Directors of Sugarland are members of the Kempner family, with one exception.

Messrs. Mafrige, et al., through the Court's ruling on the motion for temporary injunction. Any amounts allowed to our firms as compensation or as reimbursement of expenses by the Court shall be credited to your obligation, and if the amount so credited, added to the amount paid by Messrs. Mafrige, Rizk and the principal partners of Shindler/Cummins, Inc. and by you, shall exceed your obligation hereunder, the excess paid by Messrs. Mafrige, Rizk and the principal partners of Shindler/Cummins, Inc. and by you, as the case may be, shall be refunded to the parties as their interests may appear."

On March 14, plaintiffs accepted the terms in writing.

Three days later, on March 12, Mr. Prappas sent a letter to R–S–C confirming its $10,000 commitment and noting that the sum was not subject to being excused. In pertinent part, the letter states:

"We wish this memorandum to confirm our understanding concerning the contribution by you, Fred Rizk and the principal partners of Shindler/Cummins, Inc. of a total of $10,000.00 towards the cost of the above captioned litigation. Mr. Russell J. Simon of Shindler/Cummins, Inc. advised us on March 4, 1973, that Fred Rizk and the principal partners of Shindler/Cummins, Inc. would each contribute $2500.00 and you would contribute $5,000.00 towards the matter.

In connection with this dispute, both our firm and the firm of Morris, Nichols, Arsht & Tunnell intend to petition the Court for the allowance of attorney's fees and expenses.

Any amounts allowed to our firms as compensation or as reimbursement of expenses by the Court shall be credited to this obligation and if the amount so credited added to the amount paid by you, shall exceed this obligation, the excess paid by you shall be refunded to you. Consequently in the event we recover the amount to be contributed by you, we shall reimburse you for the amounts advanced."

On March 22, the Chancellor filed an opinion in which he ruled that Sugarland would be enjoined from accepting the White and Hill proposal and ordered competitive bidding for the Sugarland properties. The opinion was implemented by order dated April 10. Because this created a conflict between the Thomases who, as Sugarland shareholders, wanted the sale to bring top dollar, and R–S–C, which wanted the property at the lowest possible price, the Prappas firm (by letter dated April 6, 1973) withdrew from its representation of R–S–C.

Thereafter, Sugarland conducted a sale by sealed bids, and on April 30, the Gerald D. Hines Interests submitted the highest bid, an offer of $37,229,069 for the South Tract. Hines later negotiated for Sugarland's North Tract and on July 3 entered into a contract for both the North and South Tracts. Hines' bid on the North Tract similarly exceeded the next highest bid on that tract by about $1,243,139. The total price for both properties was about $44,000,000. (The closing was held on December 14, 1973.)

On July 25, after Hines had contracted to buy both Tracts, the Prappas firm wrote to the Thomases "releasing" them from the fee agreement. The letter states:

"In reviewing the files we find that our last letter to you concerning fees was on March 9, 1973.

That letter was written at a time of course, when the principals of Shindler/Cummins, Inc. [R–S–C] had agreed to pay $10,000.00 toward fees and costs of this litigation through the Court's ruling on the motion for a temporary restraining order, and provided that both of you would be responsible for any fees in excess of that amount through the same period of time.

When we withdrew our representation of Shindler/Cummins, Inc., we agreed that there would be no fee owing from them and correspondingly, that you also would be released of any responsibility to us for the payment of a fee. For any fees we look simply to our right to petition the Court for an allowance as recited in our letter of March 9th.

Of course, you at all times remain responsible to us and Messrs. Morris, Nichols, Arsht & Tunnell for the out-of-pocket expenses and disbursements of our firms, in the event that such should not be awarded to us by the Court."

Meanwhile, on April 30, a second action on behalf of the same plaintiffs by the same attorneys against the same defendants had been filed in the Court of Chancery; on November 12, a supplemental complaint was filed, thereby beginning the "damage" or Phase II of this controversy. That action was essentially a claim for damages against the Sugarland directors. Unlike the first or injunctive phase which was swiftly concluded, the second phase remained unresolved over the next three years and consumed some 13,000 hours on the part of lawyers (and their respective staffs) representing plaintiffs.

On November 10, 1977, a settlement of the Phase II litigation was finally made and approved by the Court of Chancery. While the complaint addressed to the second phase had alleged wrongdoing involving Sugarland, the terms of settlement did not directly affect the corporation; they centered, rather, on a reorganization of the management of various other business entities owned by the Kempner family.

After the settlement had been approved, plaintiffs' attorneys filed an application in the Court of Chancery seeking a combined fee of approximately $6 million for their services as to Phases I and II of the litigation.

The United States National Bank of Galveston, Trustee (intervenor) owns some 47,-500 shares (about 23%) of Sugarland stock. It entered the litigation as an objector to the fee application.

2. For convenience, we will hereafter refer to the attorneys whose compensation is in issue as "petitioners." They include, of course, both the Delaware and Texas firms. All parties tacitly concede that whatever fee arrangements plaintiffs made with Prappas are equally applicable to Delaware counsel.

3. By February 3, 1982, the total fee of $3.5 million will have been paid, if Hines complies with his payment obligations.

On January 26, 1979, the Chancellor awarded plaintiffs' counsel[2] a fee of $3,500,000 computed as follows: (a) as to Phase I, a fee equal to 20% of the benefit created by their efforts, with a cap of $3 million, and (b) as to Phase II, the sum of $500,000 for time expended in achieving the settlement. An order implementing the opinion was entered on May 11, 1979. It directed that $1,376,130 be paid within the month, and required that the remainder be paid "if, as, and when" Sugarland received additional monies in the future from Hines.[3] It also provided that petitioners would be entitled to 6% interest on any late payments made by Sugarland.

Defendant and the intervenor have docketed this appeal, while petitioners have cross-appealed from the Chancellor's orders denying them pre-judgment interest and limiting post-judgment interest to 6%.

## II

We consider, first, the arguments made by the United States National Bank of Galveston, Trustee. Basically, the intervenor makes two contentions: (a) petitioners contracted for compensation on the basis of their normal hourly rate, they are bound by that agreement and, therefore, the Chancellor erred as a matter of law in awarding fees on a benefit basis for Phase I,[4] and (b) Sugarland did not benefit from the Phase II efforts of counsel and, therefore, should not be obliged to pay for them.

## A.

First, as to Phase I, the intervenor attacks petitioners' contention that there was not an agreement relating to fees. The Bank says that the March 9, 1973 letter

4. Sugarland concedes that petitioners are entitled to compensation in excess of their normal hourly rate, but argues that the Phase I fee allowed by the Trial Judge is grossly excessive. We will discuss that argument later in this opinion.

from the Prappas lawyers and the acceptance of its terms by plaintiffs constituted such an agreement and that it was unilaterally released by petitioners on July 25, 1973, some four months after the Chancellor had ruled that Sugarland would be enjoined from accepting the White and Hill offer and after Hines had contracted to buy the tracts for at least $15,000,000 more than White and Hill had offered. The intervenor argues that all Phase I relief had been obtained and, under the fee agreement, petitioners were entitled to about $90,000; then, continues the intervenor, petitioners removed that ceiling by terminating the contract on which it was based so that they could improve their posture for fee purposes. In short, says the intervenor, petitioners went the contingency–fee route after all contingencies had been eliminated.

■ For present purposes, we regard the July 25, 1973 release of plaintiffs by petitioners of the March 9, 1973 fee agreement as a nullity. But it does not follow that petitioners are limited to the hourly rate of compensation specified in the March 9 agreement. We say this for several reasons:

First, the hourly rates are described as "minimum" and, while that does not mean that they are what the intervenor characterizes as "bargain basement" quotes, it is important in context because the word is used again in reserving to counsel the right to petition "the Court for allowance of attorney's fees predicated upon the time involved, the number and complexity of legal issues involved and the results accomplished for the benefit of all the shareholders of Sugarland Industries, Inc."

Second, the character or nature of the reservation is significant, that is, additional fees might be sought on the basis of the "results accomplished for the benefit of all shareholders of Sugarland Industries, Inc." That is the common yardstick by which a plaintiff's counsel is compensated in a successful derivative action. Cf. *Dann v. Chrysler Corporation*, Del.Ch., 215 A.2d 709 (1965), aff'd 223 A.2d 384 (1966); *Gottlieb v. Heyden Chemical Corp.*, Del.Supr., 105 A.2d

461 (1954). And the action filed for the Thomases was a stockholders' derivative suit.

Third, the Chancellor found that the object of plaintiffs' counsel was to obtain the best available price for the South Tract and, in so doing, to benefit all stockholders. Clearly, there is substantial evidence in the record to support that finding.

We should also note that the March 9 letter, arguably at least, limits the hourly fee arrangement to a period ending with the "Court's ruling on the motion for temporary injunction."

For these reasons, we are not persuaded that the reference to an hourly rate of compensation in the fee arrangement limits petitioners to that "lodestar" under the record before us.

Relying on *Maurer v. International Re–Insurance Corp.*, Del.Supr., 95 A.2d 827 (1953), the Bank also argues that the Chancellor should have limited the Phase I award to that which plaintiffs would have been obliged to pay; and it says that the Court should regard the application as one coming from plaintiffs, not the petitioning attorneys, for reimbursement of their obligation for fees.

*Maurer* is a basic restatement of the principles on which fees are allowed to an attorney by a Delaware Court, but we are not persuaded that the reference therein to the "reimbursement" concept of fees can be fairly applied here to deprive petitioners of the right to seek additional compensation from the Court. That right was the basis on which they agreed with the Thomases at the beginning of the representation on March 9, 1973. Compare the analysis made in *Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. San. Corp.*, 3 Cir., 487 F.2d 161 (1973) (*Lindy I*). And see an *en banc* opinion in the same case, 540 F.2d 102, 110 (1976) (*Lindy II*). And the agreement contemplated legal services, not for the Thomases alone, but for the benefit of all Sugarland shareholders. The Chancellor determined that such was a purpose of the Phase I litigation, and that ruling is consistent

with and supports the agreement itself. Since benefit to all shareholders was an objective of counsel and since the contemplated benefit achieved was within the scope of the fee contract, it would be patently unfair to now deprive petitioners of compensation based on an advantage which their efforts secured for all Sugarland stockholders.

And to the extent the Bank argues that because petitioners were not "at risk" for their services (that is, the fee arrangements were not entirely contingent) and, for that reason they are not entitled to additional compensation, we decline to adopt that as Delaware law in this case in which the fee contract provided otherwise.

The Bank's arguments directed to the amount allowed by the Chancellor will be considered later in this opinion. With that exception, we conclude that the intervenor's contentions as to the Phase I allowance are without merit.

### B.

Turning now to the Bank's attack on the allowance of fees for Phase II services, it argues that such fees were improperly charged to Sugarland because it did not benefit from petitioners' services.

The Phase II settlement did not result in the creation of a fund or transfer of a tangible benefit to Sugarland. The Bank concedes, tacitly at least, that the case was settled in the interest of "family harmony" by effecting a reorganization of the personnel of the boards or management of the various Kempner entities.

In his opinion, the Chancellor described in some detail the changes in management effected by the settlement agreement, and it is unnecessary to repeat them here. It is enough to say that they were numerous and relatively complex; they involved some eight or nine separate entities and a seemingly endless series of personnel changes and power balancing. As we see it, the result was accurately summarized in the Chancellor's opinion, thus:

"...

As to the second phase application, I am satisfied that petitioners are entitled to be compensated on the non–pecuniary results of their effort to bring harmony to the Kempner family although such benefit does not inure directly to the benefit of Sugarland Industries and its stockholders.

. . . . .

Petitioners will be allowed the amount of $500,000 for the time expended and effort exerted by them during the second phase of this case, which resulted in a settlement which promises to terminate the feud which has split the Kempner family in recent years, thus indirectly benefiting Sugarland Industries and its stockholders, compare *Dann v. Chrysler*, supra, and *Chrysler Corporation v. Dann*, supra, . . . ."

It is undisputed that the settlement agreement was the culmination of long and intensive efforts by counsel over many years. Sugarland was not a direct beneficiary of the "family harmony" which, legally speaking at least, resulted from the settlement. But it was very much involved in both lawsuits and it was a party to the settlement of both of them. Indeed, the purpose of the settlement agreement was to "settle all claims" in both actions [5] and thus to put an end to the controversy and the

---

**5.** The agreement provides in part, as follows:
"I. 1. The purpose of this agreement is to settle all claims remaining in the above litigation, and the agreement and actions contemplated in Section II hereof are the direct result of the assertion and prosecution of such claims, derivatively by plaintiffs for the benefit of defendant Sugarland Industries, Inc. ("Sugarland").
2. Section II of this agreement and the actions that it contemplates provide a sub-

stantial, real benefit to the body of stockholders of Sugarland, constituting a proper basis and appropriate, commensurate consideration for the settlement of the remaining claims of Sugarland, which is itself in the course of liquidation.
3. The parties will each support the settlement and will each promptly seek the required judicial approval for it."

issues in litigation. A hearing was held and the settlement was approved on the basis of Sugarland participation in it. Prior thereto, notice as to the agreement, the stipulation of settlement, the other pertinent documents and the date of hearing was sent to all Sugarland stockholders, including the Bank. The Bank elected not to appear nor to challenge the settlement. It arrived only after the *fait accompli* to challenge the right of the settling corporation to pay counsel fees.

In the stipulation of settlement, Sugarland reserved the right "to object to any application for allowance of fees and expenses of plaintiffs and their attorneys," but the stipulation also provides that "Sugarland has determined that this settlement is beneficial to it and in the best interests of Sugarland and its stockholders." Given that representation by Sugarland to the Court before the settlement was approved, Sugarland's reservations as to fees might well be construed as going to the amount of any allowance, not to whether it had, in principle, any duty to pay an allowance.

In any event, we are satisfied that the Chancellor properly invoked his power to order Sugarland to pay fees to petitioners for Phase II services. In saying this, we note that most of the stockholders of Sugarland are also (in the same proportion) stockholders in or beneficial owners of other Kempner enterprises,[6] and that Sugarland was in liquidation. Compare *Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Richman v. DeVal Aerodynamics, Inc.*, Del.Ch., 185 A.2d 884 (1962).

### III

We now consider Sugarland's argument that the fee awarded for Phase I is grossly excessive under any standard.[7] The thrust of the argument is that petitioners had

expended only $122,881 worth of time, at their regular hourly rates, and that the percentage approach adopted by the Chancellor was arbitrary under the circumstances.

■ The standard of review of an award of attorney fees in Chancery is well settled under Delaware case law: the test is abuse of discretion. *Chrysler Corporation v. Dann*, Del.Supr., 223 A.2d 384 (1966); *Krinsky v. Helfand*, Del.Supr., 156 A.2d 90 (1959); *Treves v. Servel, Inc.*, Del.Supr., 154 A.2d 188 (1959); cf. *Allied Artists Pictures Corporation v. Baron*, Del.Supr., 413 A.2d 876 (1980). The Third Circuit applies the same standard, *Lindy I.*

As to the amount of the fee, Sugarland observes that there is no real dispute between the parties as to the "elements of the Delaware standard" governing fees. It argues that the "results achieved" by counsel plus the following factors stated by the Chancellor are pertinent:

"... the amount of time and effort applied to a case by counsel for plaintiff, the relative complexities of the litigation, the skills applied to their resolution by counsel, as well as any contingency factor and the standing and ability of petitioning counsel are, of course, considered in the award of fees in an appropriate case, *Chrysler Corp. v. Dann*, Del.Supr., 223 A.2d 384 (1966), aff'ing *Dann v. Chrysler Corp.*, Del.Ch., 215 A.2d 709 (1965), *McDonnell Douglas Corporation v. Palley*, Del.Supr., 310 A.2d 635 (1973), and *Richman v. DeVal Aerodynamics, Inc.*, Del.Ch., 185 A.2d 884 (1962)."

Sugarland invites our attention to *Lindy I*, an opinion authored by Chief Judge Seitz, who served as Chancellor of Delaware (and before then as Vice Chancellor) for some twenty years during which he ruled on many applications for counsel fees. Sugarland argues that Delaware should adopt the

---

6. The settlement agreement states that most of the Sugarland stockholders are "members of the Kempner family and are also stockholders or beneficial owners, in substantially the same proportions among members of the family, of the other Kempner family enterprises ...."

7. As we have observed, the Bank also argues that the fees allowed for both Phases are excessive. We discuss the amount of each award in terms of Sugarland's contentions, but our comments apply equally to those made by the Bank.

*Lindy I* guidelines as other jurisdictions have done.[8]

The evolution of *Lindy I* has not been limited to jurisdictions other than the Third Circuit. Indeed, the case has its own progeny in *Lindy II*, an *en banc* ruling by the Third Circuit; see also *Baughman v. Wilson Freight Forwarding Co.*, 3 Cir., 583 F.2d 1208 (1978).

As we understand Sugarland's contention, *Lindy I's* principal significance for Phase I purposes is its emphasis on the "time factor" and because petitioners' entire fee was not "at risk."

Under *Lindy I*, the Court's analysis must begin with a calculation of the number of hours to be credited to the attorney seeking compensation. The total hours multiplied by the approved hourly rate is the "lodestar" in the Third Circuit's formulation. It has, indeed, been said that the time approach is virtually the sole consideration in making a fee ruling under *Lindy I*. Be that as it may, we conclude that our Chancery Judges should not be obliged to make the kind of elaborate analyses called for by the several opinions in *Lindy I* and *Lindy II*. To put it another way, while *Lindy's* careful craftsmanship has much to commend it, we are not persuaded that our case law governing fee applications is an inadequate criterion for a fair judgment in this case, nor that new guidelines are needed for the Court of Chancery.

It is undisputed that the White and Hill offer was $23,800,000, so, in one sense, petitioners are entitled to "some" credit for any amount received by Sugarland in excess of that sum.

The Chancellor determined that petitioners are entitled to a fair percentage of the benefit inuring to Sugarland and its stockholders from the sale of both Tracts to the Hines group; he computed the monetary benefit to Sugarland, as a result of petitioners' efforts, to be about $21,812,000. That figure gives petitioners full credit for all of the additional cash received or to be received, including principal and interest, from the sale of both tracts. The Chancellor held that petitioners are entitled to 20% of the fund thus created through their efforts, but subject to a $3,000,000 cap. Petitioners say that with that limitation, the award computes to about 14% of the benefit conferred.

■ We agree with substantially all of the Chancellor's findings and most of his conclusions, but we are unable to agree with him on one significant element in his formulations: in measuring benefit, he credited petitioners with all amounts received or to be received by Sugarland in excess of the White and Hill offer of $23,800,000. In our view of the case, petitioners' services and the nature of the benefits separate into two distinct parts and the R–S–C offer is at the dividing line between them.

It is crystal clear from the record that the services of petitioners benefited Sugarland to the extent of the difference between the White and Hill offer of $23,800,00 and the $27,000,000 which was submitted by R–S–C. But how one should view the amount received by Sugarland in excess of the $27,000,000 is not so clear. Petitioners had sought the best price obtainable and but for their initiative (and success) at the injunctive stage, Sugarland might not have received anything over the White and Hill offer. Thus, there is, as we have noted, "some" cause and effect between what petitioners did and the ultimate price received. But petitioners are attorneys seeking compensation for services rendered in litigation. They are not brokers or real estate agents seeking a commission or a percentage of sale price for having produced a buyer. And how much anyone would pay, at least in excess of the $27,000,000 offered by R–S–C, was a circumstance neither caused nor influenced by petitioners. The highest offer eventually made has in it something in

**8.** See, for example, *City of Detroit v. Grinnell Corporation*, 2 Cir., 495 F.2d 448 (1974); *Grunin v. International House of Pancakes*, 8 Cir., 513 F.2d 114 (1975), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *National Treasury Employees Union v. Nixon*, D.C.Cir., 521 F.2d 317 (1975).

the nature of the "windfall" to which Chancellor Seitz referred in the *Chrysler* case, where "benefit" for fee purposes was also in issue; he wrote:

"... Certainly plaintiffs cannot take credit for the benefit flowing from the great increase in profits to the extent they resulted from the general resurgence of the automobile industry."

215 *A.2d* at 716. While the cases certainly are not parallel, petitioners here cannot take full credit for the price which Hines was willing to pay for both tracts.

There is also another factor which relates to the amount of compensation. We have rejected the Bank's contention that petitioners were limited by contract to an hourly fee rate, but that did assure *some* compensation for services, at least through the restraining order phrase, and thus petitioners were not providing services entirely on a contingent basis.

Sugarland has taken the position that if the Court reduces the fee award, we should, in the interest of justice and judicial economy, determine the appropriate fee. We conclude that it is appropriate for us to do so in this case.[9]

In making the award, the Chancellor used a 20%–of–benefit factor and that seems reasonable to us when applied to the difference between the respective offers. But for the reasons we have discussed, it is unreasonable when applied to the amounts paid by the buyer in excess of the $27,000,-000. We have held that petitioners are entitled to some credit for the benefit received in excess of that sum and, in view of the circumstances, any percentage is arguably fair or not, depending on one's point of view. In our judgment, based on the various factors we have noted, compensation at the rate of 5% of the benefit achieved is fair and should be applied to the additional benefits Sugarland received from the sale of both the North and South Tracts. Given the fee which that percentage generates (about $573,609 in all), we conclude that it is reasonable (and perhaps generous) compensation for the significant skills and expertise which petitioners demonstrated in identifying an inadequate price for the Tracts, in stimulating the competitive offer from R–S–C, in quickly initiating the litigation, in successfully carrying it to a conclusion against highly competent counsel and thus opening the door for entry by the Hines Interests with their offers.

The total amount to be allowed to petitioners as compensation for Phase I services (on an "if, as and when" received basis) is computed as follows:

South Tract

| R–S–C Offer | $27,000,000 |
|---|---|
| White and Hill Offer | 23,800,000 |
| | $ 3,200,000 |
| | |
| Hines Purchase Price | $37,229,069 |
| R–S–C Offer | 27,000,000 |
| | $10,229,069 |

North Tract

| Additional Benefit (Cash) | $ 1,243,139 |
|---|---|

Computation of the Fee

| 20% x $ 3,200,000 | | $ 640,000 |
|---|---|---|
| 5% x 10,229,069 | | 511,453 |
| 5% x 1,243,139 | | 62,156 |
| | Total | $ 1,213,609 |

It is difficult to test this allowance on an hourly rate basis because that was not determined by the Chancellor and, indeed, was not crucial to the awards he made.

9. See *United States v. Equitable Trust Co. of New York*, 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379 (1931); *City of Detroit v. Grinnell Corp.*, 2 Cir., 560 F.2d 1093 (1977); *Ellis v. Flying Tiger Corporation*, 7 Cir., 504 F.2d 1004 (1972); *Union Central Life I. Co. Inc. v. Hamilton Steel Prod., Inc.*, 7 Cir., 493 F.2d 76 (1974); *Freeman v. Ryan*, D.C.Cir., 408 F.2d 1204 (1968); *Milwaukee Towne Corp. v. Loew's, Inc.*, 7 Cir., 190 F.2d 561 (1951), *cert. denied* 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952); *Twentieth Century-Fox F. Corp. v. Brookside Th. Corp.*, 8 Cir., 194 F.2d 846 (1952), *cert. denied* 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952); *Columbian Nat. Life Ins. Co. v. Keyes*, 8 Cir., 138 F.2d 382 (1943), *cert. denied* 321 U.S. 765, 64 S.Ct. 521, 88 L.Ed. 1061 (1944); *Kuhn v. Princess Lida of Thurn & Taxis*, 3 Cir., 119 F.2d 704 (1941).

And the allocation of hours is a matter of dispute in this Court. For present purposes, we note only that Sugarland agreed that the total time given to both phases of the litigation by petitioners and their staffs totals 15,110.8 hours. Petitioners say that it amounts to more than that, including about 2,800 [10] hours in 1973 for the Phase I representation. In our view of the appeal, we need not resolve the time controversy.

### IV

Turning now to Phase II, Sugarland also argues that the $500,000 allowed by the Chancellor is grossly excessive, under any standard.

It is apparent that the Chancellor based the award for this phase largely on a "time and effort" basis. Specifically, he said:

> "As to the second phase application, I am satisfied that petitioners are entitled to be compensated on the nonpecuniary results of their efforts to bring harmony to the Kempner family although such benefit does not inure directly to the benefit of Sugarland Industries and its stockholders.
>
> .     .     .     .     .
>
> Petitioners will be allowed the amount of $500,000 for the time expended and effort exerted by them during the second phase of this case . . . ."

■ Given the extraordinary difficulties involved in this phase and the central purpose accomplished (family peace by litigation settlement), we conclude that the Chancellor did not abuse his discretion in making the award. Tested on an hourly rate basis, the $500,000 computes to $50 per hour, if only 10,000 of the agreed 15,110.8 hours were assigned to this phase. And that is a modest rate.

■ Finally, we conclude that the Chancellor did not abuse his discretion in denying petitioners pre–judgment interest and limiting post–judgment interest to 6%. Cf. *Universal City Studios, Inc. v. Francis I.*

*duPont & Co.*, 334 A.2d 216 (1975). It follows, therefore, that judgment will be entered for Sugarland in the cross appeal.

Affirmed in part and reversed in part with directions to enter judgment in accordance herewith.

Upon motion for reargument.
Motion denied.

DUFFY, Justice:

Petitioners filed a motion for reargument of the Court's opinion and, at our request, defendants have filed their respective answers to it. See Rule 18. Petitioners make three principal arguments, all of which focus on the approach the Court used to measure the "benefit" to the Sugarland stockholders, which was the basis for the fees allowed.

First, petitioners argue that it was improper for the Court to fragment the benefit they provided to the stockholders. They say that such an approach has not been used before and that it is not applicable in the present factual context. Petitioners renew their contention that the 20% rate adopted by the Chancellor should be applied to the entire benefit which the stockholders received because the original sale was not made for $23,800,000. They argue that their efforts caused the Chancellor to open the bidding, which led to the Hines offer and thus they were directly responsible for the entire benefit which that bid produced.

Much of this repeats the prior arguments made by petitioners. But we do note that this case differs factually from a derivative action in which, for example, directors were required to restore to the corporation money improperly paid or stock options improperly given. In such a case, the benefit to the corporation is measured in dollars and there is a direct causal relationship between the actions of counsel and creation of the "entire" fund or benefit conferred. That is not this case.

---

**10.** All of Phase I was completed in 1973. Accepting petitioners' representations that they gave 2,800 hours to that Phase, then the allowance made herein computes to about $433 per hour.

As indicated in the opinion, petitioners were responsible for submission of the $27,000,000 offer by R–S–C and, in fact, Houston counsel assisted in the formation of the R–S–C group. And that bid was an important part of the factual case which petitioners made before the Chancellor in their case for injunctive relief. For that reason, we agreed with the Chancellor that petitioners should receive 20% of the benefit that offer produced for the stockholders.

But, by contrast, petitioners did not help to produce the Hines offer and it played no part in the outcome of the litigation. Nevertheless, petitioners argue that they are entitled to 20% of the benefit from the Hines offer because from the beginning, they "were seeking the best available price" for the land, and the Hines bid was within the projected price range. Accepting that assertion, the objective of counsel in a lawsuit of this kind is not a very useful standard for measuring fair compensation. If it were, the *ad damnum* clause in a pleading would be a handy reference for fee–fixing purposes. But, under Delaware law, as petitioners have conceded, benefit to the corporation flowing from the conduct of counsel is what must be established. And as to that, we remain convinced that petitioners are not entitled to as high a percentage of the benefit from a bid they neither caused nor influenced, as they are from the R–S–C offer, which they did help to produce and which was central to their success before the Chancellor. Cf. *Dann v. Chrysler Corporation*, Del.C., 215 A.2d 709, 719 (1965), aff'd, 223 A.2d 384 (1966).

Petitioners also argue that our approach was improper because it was "novel and was nor fairly urged below." But, in fact, the award was based on the benefit which the stockholders received and the nature of petitioners' contribution, including time, effort and skill, in producing that benefit. Such an approach is characteristic of that traditionally taken by courts of this State in derivative actions. *Dann v. Chrysler Corpo-*

*ration*, supra. Contrary to petitioners' assertion, that approach was urged by defendants and, in any event, this Court's function is to determine whether the Chancellor abused his discretion and, in doing so, we are not limited to the arguments made by counsel.

Petitioners' final argument is that there were certain oversights in the opinion. They say, first that the Court failed to consider the savings to Sugarland which resulted when both the South and North Tracts were acquired by the same purchaser, thus eliminating the need for a drainage connector between the Tracts. There is merit to this and the opinion is modified by awarding petitioners an additional 5% of the $240,000 benefit, or $12,000.[1]

Petitioners argue that other adjustments to the award should be made, including an allowance for additional interest that the Sugarland stockholders will receive. Viewing the award as a whole, the fees allowed are fair and reasonable and we decline to order any increase in them.

We cannot conclude this supplement to the opinion without making a few general observations about the result.

It is often difficult for attorneys engaged in the practice of law to determine what fee a client should be charged. Sometimes, it is equally troublesome for Judges to determine a fair and reasonable fee for lawyers. That is certainly true in this case, which involves highly professional, experienced and competent lawyers who gave an enormous amount of time over a period of seven years to the litigation, and which requires review of an award by a Chancellor who probably has had as much (or more) experience with fee applications as any Judge in our history. We are much aware of these aspects of the appeal but, in the final analysis, we must meet our own responsibilities as a reviewing Court.[2]

The motion for reargument is denied.

1. The Chancellor found that the benefit totaled $240,000, and petitioners have not objected to that finding. This addition makes the award the equivalent of $437 per hour.

2. Petitioners say that our ruling "makes the cases a bad business deal for ... [them] to have undertaken, despite the success with the merits." That contention implicitly relies on

the total number of hours spent on *both* Phases of the litigation, including the period 1974 through 1978 which was given exclusively to Phase II; and it ignores the fact that *all* of the legal services for which compensation is under review were completed in 1973. The bulk of petitioners' time, totaling between 10,000 and 12,000 hours, was given to Phase II, for which the Chancellor allowed $500,000. The amount of that award, while modest, is not subject to reversal from either side as an abuse of discretion because there are considerations relating to quality of corporate benefit on the one hand and considerations of genuine non–pecuniary benefits on the other. Clearly, the Court cannot increase the Phase I compensation to give petitioners a better hourly rate for Phase II. And as to Phase I, compensation at the rate of $437 per hour is, in our judgment, generous by almost any standard. Indeed, we are unaware of any hourly rate in any case in any jurisdiction which exceeds it.