In re ABERCROMBIE & FITCH CO. SHAREHOLDERS DERIVATIVE LITIGATION:

John O'Malley, Derivatively on Behalf of Nominal Defendant Abercrombie & Fitch Co., Plaintiff Below, Appellant,

v.

Michael S. Jeffries, Seth R. Johnson, John W. Kessler, Archie M. Griffin, Russell M. Gertmenian, Samuel N. Shahid, Jr., John A. Golden, Edward F. Limato, James B. Bachmann and Lauren J. Brisky, Defendants Below, Appellees,

and

Abercrombie & Fitch Co., Nominal Defendant Below, Appellee.

No. 282,2005.

Supreme Court of Delaware.

Submitted: Aug. 12, 2005.
Decided: Oct. 26, 2005.

---

Michael Hanrahan, and Gary F. Traynor, Esquires, of Prickett, Jones & Elliott, P.A., Wilmington, for appellant.

Lisa A. Schmidt, Esquire, of Richards, Layton & Finger, Wilmington, Delaware and Andre G. Bouchard, Esquire, of Bouchard, Margules & Friedlander, of Wilmington, for appellees.

Before STEELE, Chief Justice, JACOBS, and RIDGELY, Justices.

RIDGELY, Justice.

This is an appeal from the Court of Chancery's order awarding attorneys' fees in a derivative shareholder action. Appellant sought fees of $1.2 million under a Settlement Agreement. The Court of Chancery awarded $217,799.75. On appeal, Appellant, John O'Malley argues that the Court of Chancery used the wrong legal standard by basing the fee award on the Lodestar method rather than the standard this Court established in *Sugarland Indus. v. Thomas*.[1] The Appellees have not filed an answering brief.[2] The appeal is being considered on the Court of Chancery record and the Appellant's opening brief. We conclude that the Court of Chancery used the correct legal standard, considered appropriate factors, and did not abuse its discretion in its determination of attorneys' fees. Accordingly, we affirm.

## I.

A consolidated derivative complaint on behalf of Abercrombie's shareholders alleged excessive compensation, corporate waste, and failure to disclose the total compensation of Michael S. Jefferies, Chairman and Chief Executive Officer of

---

1. 420 A.2d 142 (Del.1980).

2. Pursuant to the Settlement Agreement, Appellees agreed that they would take no position on Appellant's fee and expense application.

Abercrombie & Fitch Co ("Abercrombie"). The action resulted in a Settlement with Abercrombie. After executing the core provision of the Settlement, the parties engaged in further arms-length negotiations over the amount of attorneys' fees and expenses Plaintiffs' Counsel would seek in connection with the Settlement. Defendants agreed to pay Plaintiffs' Counsel $1.2 million in fees and expenses. The Court of Chancery held a settlement hearing to consider the Settlement and attorneys' fees.

The Chancellor awarded $217,799.75 in fees and expenses for attorneys' fees. In a letter to counsel he wrote:

I enclose a copy of the Order approving the settlement and awarding counsel fees (including costs) of $217,799.75. Net of expenses, this is a fee of $197,286.86, which translates to a rate of $1,061/hour of attorney time. At their normal billing rate, the amount owed to plaintiffs (lodestar) would be $82,326. The $197,286 figure is 2.39 times that amount-a significant premium, but well within the range of reasonableness for this kind of litigation. I cannot agree with plaintiffs' counsel's request for $1.2 million, which would yield a multiple of 14.33 over lodestar-a premium in excess of any premium awarded by this Court (to my knowledge). The 2.39 multiple that I have used here is fair and reasonable in light of all the factors, including

the contingency fee risk, difficulty of the litigation, and benefit achieved.

## II.

■ "The determination of any award is a matter within the sound judicial discretion of the Court of Chancery."[3] In *Sugarland*, we established the appropriate standard by which the awarded fees are to be calculated.[4] As we have summarized, these relevant factors include: "(1) the results accomplished for the benefit of the shareholders; (2) the efforts of counsel and the time spent in connection with the case; (3) the contingent nature of the fee; (4) the difficulty of the litigation; and (5) the standing and ability of counsel involved."[5] Delaware Courts have also recognized that time is also a relevant inquiry in determining fee awards.[6]

## III.

■ Appellants argued that the Chancellor's award of $217,799.75 is based on the "lodestar" method and is inconsistent with *Sugarland* and its progeny. A review of the settlement hearing does not support Appellants' argument. At the settlement hearing, the Chancellor noted:

You say cases. We-we sometimes do, sort of as a-*a backstop check*, an analysis of the hours invested. And when you-when you do that analysis, this-this generates a fairly significant hourly rate, which, *when I contrasted* that with the

3. *In re Infinity Broad. Corp. Shareholders Litig.*, 802 A.2d 285, 293 (Del.2002) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del.1998)).

4. *Sugarland*, 420 A.2d at 149.

5. *In re Infinity Broad. Corp*, 802 A.2d at 293 (footnote omitted).

6. *See In re Prodigy Communications Corp. Shareholders Litigation*, 2002 WL 1767543, *6

(Del.Ch.2002) ("In awarding fees in class action litigation, Delaware courts typically consider a number of factors, including the following: the results achieved in the litigation, the contingent nature of the fee arrangement, *the amount of time and effort applied*, the complexities of the engagement, the quality of the work performed, and the standing and ability of the lawyers involved") (*citing Sugarland*, 420 A.2d at 149) (emphasis added).

cases you cited, was-was *far beyond* what any of those cases had ever approved.[7]

The Chancellor's language indicates that use of hours invested, per the lodestar method, was intended as a "backstop check," or as a means to evaluate the propriety of the amount of the award against the $1.2 million asked for by plaintiffs.

Consistent with *Sugarland* and its progeny, the Chancellor considered all relevant factors. Undercutting the value of the settlement to individual shareholders was the Chancellor's disagreement with the actual amount saved by the settlement, as put forth by Appellant's expert, as well as the overall likelihood of success on the merits of the plaintiffs' position, should it have ever gone to trial. The Chancellor specifically inquired about the amount the plaintiff's expert estimated had been saved as a result of the settlement.[8] Most notably the Chancellor recognized the value of the settlement to individual shareholders:

> But let me tell you, frankly, I'm going to approve the settlement. I think for all the reasons...identified...it was a reasonable settlement in the best interests of all to be settled and resolved the way it was. The litigation of it was going to be a tough climb, as I think your brief and your remarks recognize.

> \*\*\*

> The-the only part about this that I really disagree with you about-and it's not a serious disagreement-is on the fee...

> \*\*\*

> I think what we struggle with on this Court all the time is what's a fair and reasonable fee...and we try very carefully and thoughtfully to make sure that we're awarding fees that both compensate counsel for the efforts they've made, for the contingent nature of the litigation, the fact that they don't win ever case-I mean, we recognize that-that you're up against excellent opposing counsel, and you're litigating in these cases in-in difficult cases; and we look at-to the benefit that was achieved by virtue of the settlement for the shareholders.

Appellant contends that the Settlement provided important improvements in Abercrombie's corporate governance practices and procedures. The settlement also provides that for at least one year after Jeffries ceases to be an executive officer of the company, he must hold all 1 million Career Shares and one-half of the Profit Shares; he is limited from receiving additional stock options; and his Stay Bonus is reduced from $12 million to $6 million and made contingent on performance goals.

Despite the potential benefits to shareholders enumerated by Appellant, the Chancellor disagreed with the total amount actually saved for the company by the settlement. Primarily, he questioned the basis of the determination of plaintiff's expert witness. He also noted the difficul-

7. Emphasis added.

8. The Court: Well, let me move for a minute ... to what was actually achieved as a result of the settlement. Can-and you've got an expert and you've got an affidavit that you've offered, demonstrating that this saved-what's the range?—30–

Mr. Zagar: The range is 33.4 to 38 million, depending on the number of options. One of the major components is that Mr. Jeffries is foregoing any stock options for the next two years. And-

The Court: How-how does the expert conclude that foregoing those options saves the company? I mean, I can see where it-issuing the options could potentially dilute the shareholders, but how does it save the company money?

ty inherent in plaintiff's case, should it have ever gone to trial on the merits. Indeed, this very point was recognized by plaintiff's own counsel during the settlement hearing, albeit in a minimized way:

> Mr. Zagar:...That [the total amount estimated by plaintiff's expert], we think, is a very good result, particularly in light of some of the difficulties that we would have encountered had we attempted to litigate this case. We would have had to first deal with a motion to dismiss under Rule 23.1. We feel that we had good claims and good arguments for demand futility, but that certainly is by no means a foregone conclusion. And we had the additional burden of, once the committee was formed, to deal with the fact that the special committee was made up of members that appeared to be independent on their face; and that was an initial procedural hurdle even before we got to the merits of our claims.

> Assuming that we survived to the merits portion of the case-

> The Court: Well, your brief was remarkably candid on that, because I remember reading, you know, a bland, straightforward sentence in the brief that said "The brief doesn't contain sufficient particularized facts to withstand a motion to dismiss under Rule 23.1." Did I-did I misread that?

> Mr. Zagar: No, you did not misread that...

■ Appellant is correct that a court should give weight to an agreement regarding attorneys' fees, but that does not require blind acceptance. Appellant relies on the Court of Chancery's opinion in *In re Prodigy Comm. Corp. Shareholders Liti-*gation[9] to support his argument that "[w]here the parties have reached an agreement regarding attorneys' fees (after agreeing in principle to the terms of the settlement), the Court should give weight to the parties' agreement." We note that, the *In re Prodigy* Opinion addressed the weight that a court should give such agreements:

> this court will also give weight to the agreement reached by the parties in relation to fees. Necessarily, the weight given derives from and depends on the court's sense of confidence that the negotiations over the fee agreement were conducted in good faith and had no effect on the other terms of the settlement.[10]

Reviewing the Chancellor's comments from the settlement hearing, it appears to us that the court's "sense of confidence" in the basis of the agreement on fees was less than absolute.

## IV.

The record shows the Court of Chancery considered the reasonableness of the settlement and how it was in the best interests of shareholders, disagreed with Appellant's expert concerning the total amount actually "saved" by the settlement, and used the lodestar method as a means to *contrast* the amounts awarded against the amounts requested by plaintiff's counsel. Additionally, the Chancellor recognized the procedural and substantive hurdles facing the Appellant in the event of actual litigation. Given the Chancellor's analysis, which is consistent with the factors set forth in *Sugarland*, we find no abuse of discretion.

**9.** 2002 WL 1767543, at *6 (Del.Ch.2002).

**10.** 2002 WL 1767543, at *6 (citing *In re Axa Financial, Inc. Shareholders Litig.*, C.A. No. 18268, mem op. at 18, Lamb, V.C., 2002 WL 1022518 (Del.Ch. May 16, 2002)).

The judgment of the Court of Chancery
is AFFIRMED.