**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: November 19, 2018
Date Decided: February 28, 2019

Michael Hanrahan, Esquire
Paul A. Fioravanti, Jr., Esquire
Kevin H. Davenport, Esquire
Samuel L. Closic, Esquire
Eric J. Juray, Esquire
Prickett, Jones & Elliott, P.A.
1310 North King Street
Wilmington, DE 19801

Rolin P. Bissell, Esquire
James M. Yoch, Jr., Esquire
Benjamin M. Potts, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

Re: *In re Energy Transfer Equity, L.P. Unitholder Litigation*, Consolidated Civil Action No. 12197-VCG

This Letter Opinion addresses the Plaintiffs' Post-Trial Petition for an Award of Attorneys' Fees, Costs, and Expenses.

## I. Background

This litigation began on April 12, 2016. What follows is a truncated version of the facts regarding the transaction at issue; the interested reader is referred to my Memorandum Opinion of May 17, 2018[1] for a more comprehensive recitation. Energy Transfer Equity ("ETE") is a Delaware Master Limited Partnership (MLP), and is managed by the Board of Directors (the "Board" and the "Directors") of its

---

[1] *In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706 (Del. Ch. May 17, 2018).

General Partner, LE GP, LLC. The Plaintiffs[2] alleged that the General Partner of ETE breached the Limited Partnership Agreement (LPA) by issuing Series A Convertible Preferred Units (CPUs) to ETE affiliates, and that this issuance was not fair to the Partnership. They sued ETE and certain CPU recipients on behalf of the holders of Common Units (the "Unitholders"), exclusive of the Defendants and other CPU recipients. The case proceeded via vigorous litigation: with discovery, motion practice, and ultimately through trial. The suit presented complex issues of Limited Partnership law; however, I address only those facts and issues that are relevant here.

In September 2015, ETE announced its merger with the Williams Companies, Inc. ("Williams").[3] Soon after, the energy sector experienced a decline, during which ETE's unit price fell by 65.5 percent.[4] ETE's credit rating was downgraded, and access to credit became more difficult.[5] Although these changes affected the energy industry as a whole, they were particularly detrimental to ETE's Unitholders, because as an MLP, ETE distributed all of its available cash to Unitholders every quarter.[6] Moreover, consideration for the Williams merger was a mix of equity and cash; ETE's decrease in unit price meant a correspondingly large cash component would be due to Williams at closing.

---

[2] One plaintiff brought this suit; another later joined the action.
[3] *In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at *3.
[4] *Id.*
[5] *Id.*
[6] *Id.* at *4.

In light of its worsening financial situation, and in contemplation of its merger with Williams, in February 2016 ETE issued a class of securities, the CPUs, in a private offering going largely to ETE insiders.[7]  Originally, ETE had envisioned a similar offering that would be extended to all Unitholders; however, ETE came to believe that Williams would not consent to a public offering, as required by the merger terms.[8]  As originally contemplated, the public offering provided for deferred dividends, to be paid in accrued equity, rather than in cash.[9]  This would allow ETE to retain much-needed capital, with the hope that it could avoid canceling distributions to the common Unitholders.[10]  Ultimately, ETE offered its insiders sweeter terms.

Under the terms of the private offering, subscribers would receive an $0.11 cash distribution each quarter.[11]  The subscribers also received a deferred equity accrual, representing units valued at the difference between the $0.11 the subscriber received and the then-current distribution rate of $0.285, regardless of whether any distribution to common Unitholders was actually made.[12]  These terms were more favorable to the subscribers than those of the previously-contemplated public offering.  I found it reasonable to conclude that ETE's CFO "informed insiders that

---

[7] *Id.* at *5–8.
[8] *Id.* at *24.
[9] *Id.*
[10] *Id.* at *23.
[11] *Id.* at *24.
[12] *Id.*

3

a public offering to all unitholders would be unlikely, given [Williams'] lack of consent; that a Private Offering would be an alternative; that a substantial risk of distribution cuts or cancellations loomed; and that the insiders seized the opportunity to eliminate downside risk for themselves and their cronies."[13]

On April 18, 2016, about two months after the issuance described above, ETE announced that it would cut distributions to the common Unitholders.[14] Ultimately, however, the anticipated Williams merger did not close, and the energy economy recovered.[15] As a result, ETE did not cut distributions.[16] Instead, it announced that its distributions to common Unitholders would remain unchanged, at $0.285.[17] Then, on October 26, 2017—during the pendency of this litigation—ETE announced that it would increase the quarterly distributions to $0.295 per share.[18] In February 2018, ETE raised distributions a second time, to $0.305.[19] These distributions negated any damages to the Plaintiffs as a result of the CPU issuance, even though I found that the Defendants had breached their contractual duties. In short, because the economic upturn and the merger failure fortuitously coincided, ETE was able to

---

[13] *Id.*
[14] *Id.* at *14.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

maintain, and ultimately increase, distributions to nonparticipating Unitholders, so that the Plaintiffs suffered no monetary harm as result of the Defendants' breach.

In a post-trial opinion dated May 17, 2018, I found that, although the issuance of the CPUs was not impermissible under the LPA, it was nevertheless a conflicted transaction that was not fair to the Partnership.[20] Thus, in my view, the Plaintiffs prevailed in the substantive litigation, despite the lack of court-ordered relief.[21]

Subsequently, the Plaintiffs moved for an award of attorneys' fees. Contending that fees are warranted under the corporate benefit theory, the Plaintiffs point to two corporate benefits. First, the litigation "clarified" the LPA, and it "establishes that in any future conflicted transaction, the General Partner and its Affiliates must prove fairness."[22] Second, per the Plaintiffs, the distributions that occurred during the litigation were actually *a result of* the litigation, which served to simultaneously negate damages and work a corporate benefit. The Plaintiffs otherwise submit that I should use my equitable powers to award attorneys' fees.[23]

In their opposition, the Defendants argue that there is no cognizable benefit. They submit that the post-trial "guidance" that clarified the LPA is not a true

---

[20] *See generally id.*
[21] I denied the Plaintiffs' request to cancel the issuance. *See id.*
[22] Pls.' Opening Br. in Support of Pet'n for an Award of Attorneys' Fees, Costs and Expenses [hereinafter, Pls.' Opening Br.], at 11.
[23] *Id.*

corporate benefit.[24] They also contend that the distribution increases were entirely independent of the litigation, and were therefore not a benefit of the Plaintiffs' efforts.[25]

The ultimate question is this: Did the litigation provide such benefits to the entity and the Unitholders that an award of fees is warranted under the corporate benefit doctrine?

## II. Analysis

This is an unusual fee request. The litigation here was extensive. The Plaintiffs demonstrated that insiders crafted a transaction that benefited themselves at the expense of the Unitholders, in breach of the contractual analog of fiduciary duties by which the parties were bound. The benefit improperly conveyed was a downside hedge, which, as a mere fortuity, did not help—and, in fact, slightly disadvantaged—the Defendants. As a result, the breach resulted in no cognizable damages. In the face of these facts, the Plaintiffs seek fees for having worked a benefit on the Partnership. The Defendants agree that a cognizable benefit here would justify fee shifting; however, they contend that the litigation achieved no such benefit.

---

[24] Defs.' Br. in Opp'n to Pls.' Pet'n for an Award of Attorneys' Fees, Costs and Expenses [hereinafter, Defs.' Opp'n Br.], at 10.
[25] *Id.* at 14.

This jurisdiction employs the American rule on fees and expenses: winners and losers bear their own. There are exceptions, the pertinent one being that where the litigation has worked a benefit on a corporation or a class, the plaintiffs, taking only a share of the fruits of their efforts, are entitled to share their costs as well. Here, the question is, in light of the lack of damages or other meaningful remedy, what is the benefit conferred by the litigation? And to the extent that a benefit was conveyed, how should I properly evaluate the resulting equitable fee shifting? I note that each side here, although they vary wildly as to the appropriate amount of fees to be shifted, agrees that an improvidently-set fee will work a perverse incentive toward wholesome levels of entity litigation.[26]

The path that leads this Court to an appropriate fee is well-worn, if not easy to tread. I must employ the factors set out by our Supreme Court in *Sugarland*.[27] Of these, the most important is the benefit achieved, and I turn first to that consideration.

### A. *Therapeutic Benefit*

This Court, and our Supreme Court, have repeatedly found a corporate benefit sufficient to shift fees where a substantial therapeutic benefit to corporate governance was accomplished via the litigation.[28] Here, I find that the litigation has

---

[26] *See* Aug. 28, 2018 Oral Argument Tr., at 13:19–14:6; 46:13–22.

[27] The *Sugarland* factors are: (1) the results achieved; (2) the time and effort of counsel; (3) the relative complexities of litigation; (4) any contingency factor; and (5) the standing and ability of counsel involved. *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del. 1980).

[28] *See, e.g.*, *Tandycrafts, Inc. v. Initio P's*, 562 A.2d 1165 (Del. 1989); *In re Sauer-Danfloss Inc. S'holders Litig.*, 65 A.3d 1116 (Del. Ch. 2011).

resulted in a substantial benefit to the Unitholders and the Partnership, in defining the duties required in the event of a conflicted transaction.

I turn first to the Defendants' contention that litigation that merely "reminds" fiduciaries of their duties under law does not thereby work a cognizable benefit sufficient to justify shifting fees.[29] The Plaintiffs submit that a benefit of this litigation is that it clarified the Partnership Agreement. Specifically, the litigation "established that under § 7.6(f), the General Partner and its Affiliates bear the burden of proving that a conflicted transaction is fair and reasonable."[30] Moreover, as a result of the litigation, "the General Partner and its directors now know that a Conflicts Committee must be properly [composed] and established by proper procedures. . . . Resolutions and minutes must accurately record board and committee action."[31] The Conflicts Committee must be fully informed; "[i]t cannot merely be a rubber stamp for whatever the General Partner desires."[32]

In opposition, the Defendants argue that "post-trial 'guidance' is not a compensable benefit."[33]

In general, corporate fiduciaries are bound by common-law duties and the DGCL—and are charged with knowledge of those responsibilities—so a cognizable

---

[29] Defs.' Opp'n Br., 10.
[30] Pls.' Opening Br., at 11.
[31] *Id.* at 14.
[32] *Id.*
[33] Defs.' Opp'n Br., at 9.

8

benefit is not worked merely by reminding them of such.[34] In this case, however, the entity is a Limited Partnership. It was created by contract, and the parties had the opportunity to craft their relationship—with minimal limitations—as they wished, via the contract. That contract, the LPA, specifically eschews common-law fiduciary duties. Instead, it creates its own duties, including (pertinent here) for insider transactions. The universe of duties here is self-defining. The proper construction of those duties was hotly debated in the litigation. I credit the Defendants with having reached an initial interpretation of their duties in sincerity. Accordingly, I must assume that such interpretation—erroneous, as it turned out— would have continued to be held and applied by the Defendants going forward, absent this litigation. Unlike with the duties imposed by law, here the clarification that contractual duties apply in a way that is favorable to the entity and the Unitholders, and unfavorable to the Defendants, has value that justifies an award of fees.[35]

---

[34] *See Emerald P'rs v. Berlin*, 1994 WL 48993, at \*4 (Del. Ch. Feb. 4, 1994) (denying attorneys' fees where the plaintiff asserted a corporate benefit, in part, because the litigation caused the independent committee "to become aware of their duty to properly discharge their fiduciary obligations").

[35] The situation here is akin to cases involving clarification of testamentary schemes and trusts, where a party, although not achieving the relief sought, has benefitted the trust or estate by clarifying its terms. *See Ableman v. Katz*, 481 A.2d 1114, 1122 (Del. 1998), *overruled on other grounds*, *In re Last Will and Testament of Melson*, 711 A.2d 783 (Del. 1998) (attorneys' fees and costs may be awarded to the losing party where two requirements are satisfied, probable cause and exceptional circumstances); *In the Matter of Langmeier*, 1984 WL 137725, at \*6 (Del. Ch. July 20, 1984) (in awarding attorney's fees to an unsuccessful party, this Court noted that "whether exceptional circumstances exist must be made on a case-by-case basis"); *see also* Restatement (Third) of Trusts § 88 cmt. d.

9

Specifically, the LPA limits insider transactions to those transactions whose terms are "fair and reasonable."[36]  Through the litigation, the Defendants stoutly maintained that this language imposes a burden on a *challenging Unitholder* to demonstrate the lack of fairness of the conflicted transaction.[37]  For reasons adequately explained in my Memorandum Opinion, the LPA in fact imposes that burden on the insiders.[38]  Presumably, this clarification will limit marginally-unfair conflicted transactions going forward.

Next, the LPA provides a safe harbor for conflicted transactions where the Board creates an independent conflicts committee and defers to that committee's decision regarding the transaction.[39]  The Defendants maintained that the Directors' creation of a conflicts committee, composed of a majority of *conflicted* members, nonetheless provided a safe harbor for the conflicted transaction if the one unconflicted member approved.  This was an incorrect understanding of the LPA. The Plaintiffs advocated, and I found, that safe harbor under the LPA in this context required approval by a contractually-proper conflicts committee appointed by the Board, acting in good faith in consideration of the transaction.  Again, this clarification of the Partnership's governing document is a benefit to the entity going

---

[36] *In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at *2.
[37] *See id.* at *18.
[38] *See id.* at *18–19.
[39] *Id.* at *19–22.

forward.  The Defendants held an erroneous view of their duties, and acted consistent with their view but against the interest of the Unitholders.  Presumably, absent the litigation, they would have continued to do so.  To my mind, this is a benefit that justifies shifting fees.

### B. Monetary Benefit

Second, the Plaintiffs posit that they are entitled to fees because this litigation provided a monetary benefit to the Unitholders.  Per the Plaintiffs, the two distribution increases for each of the 716 million nonparticipating common Unitholders of ETE was the result of this litigation.[40]  The Plaintiffs argue that the Defendants made these distribution increases to negate the Plaintiffs' damages, as evidenced by the fact that the Defendants relied on the distribution increases in their case at trial.[41]  In short, "[t]he causal connection between the distributions and the litigation is the outcome of the litigation itself."[42]  The Plaintiffs point to the fact that the company maintained, even increased, distributions to the Unitholders throughout the course of the litigation.  They argue that distribution cuts were projected by the Defendants, and that anticipation of such prompted the improper downside hedge that was the focus of litigation in this case. They posit that the litigation made it apparent to the Defendants that they would be liable for shifting wealth to

---

[40] Aug. 28, 2018 Oral Argument Tr., at 14:14–17.
[41] Pls.' Opening Br., at 18–19.
[42] Aug. 28, 2018 Oral Argument Tr., at 5:18–20.

11

themselves, which would occur absent distributions, and that this in turn caused the Defendants to maintain, and later increase, distributions. Based on this understanding, the Plaintiffs contend that the litigation resulted in a benefit to the Unitholders, in the amount of $35.8 million, representing the increased distribution pending the litigation.[43]

The Defendants disagree. Instead, they submit that the lawsuit had no causal relationship to the distribution increases whatsoever—that ETE would have increased the distributions regardless of this litigation, particularly because those distributions are fundamental to the Partnership's business model.[44] Moreover, the Defendants reiterate that the burden falls on the Plaintiffs to demonstrate causation between the litigation and the corporate benefit, and they allege that the Plaintiffs have not done so here.[45] To the contrary, the Defendants point to evidence that supports the notion that ETE planned to increase distributions notwithstanding the lawsuit, including testimony from an ETE director and board materials,[46] as well as market analysts' predictions.[47]

There is some evidence of record indicating that the Defendants recognized a link between the litigation and the desirability of distributions. I find, however, that

---

[43] Pls.' Opening Br., at 19.
[44] Defs.' Opp'n Br., at 14–17.
[45] *Id.*; Aug. 28, 2018 Oral Argument Tr., at 35:24–36:2.
[46] Defs.' Opp'n Br., at 15–17.
[47] *Id.* at Ex. A.

the distributions made were consistent with ETE's business model and practice, and reflected market conditions and the failure of the Williams merger; I cannot tie them to the litigation with sufficient certainty to shift fees. Instead, I believe that the creation of the incentive to increase distributions can be taken into account in deciding where, in the range of a fair award, a proper fee for the therapeutic benefits should reside.

### C. Sugarland Factors and the Fee Award

The result in this matter was achieved through the Plaintiffs' extensive litigation effort. In defining the duties that the LPA imposed on the Defendants, in a way helpful to the entity and its Unitholders, the litigation worked a substantial benefit. The litigation here involved complex and difficult issues of contract and limited partnership law. It was fought through dispositive motion practice, trial, and post-trial briefing by firms and lawyers—on both sides—that are among the best in our bar, both native and *pro hac vice*. Plaintiffs' counsel expended 13,927.35 hours of attorney time, and incurred expenses of $867,233.59 on a purely fee-contingent basis. The Plaintiffs disclose that the time expended implies a lodestar of $7,672,532; this, in turn, implies a blended hourly rate of around $577 per hour, which is reasonable.

The Plaintiffs' Complaint was wide-ranging. As the Defendants point out, much of the Plaintiffs' effort was in pursuit of theories that failed, and which resulted

13

in no benefit to the entity. Given this difficult, wide-ranging, and hard-fought litigation, I assume that no more than half of the Plaintiffs' time was required to achieve the benefit. Assuming the beneficial litigation required 7,000 hours, a (rounded) quantum meruit award would be $4,039,000. Applying the same metric to costs would imply an all-in fee of $4,472,617.

This is a substantial fee. This Court has been reluctant to use *quantum meruit* as the deciding metric in corporate benefit awards due to the pernicious incentive that could create.[48] The fee implied is on the high end of what is justified by the benefit achieved. Nonetheless, I employ it here, giving due weight to the *Sugarland* factors, and noting:

1) The difficult nature of the issues and the complexity of the litigation, made more difficult by the Defendants' litigation-driven or litigation-anticipating actions, with respect to the Board and the creation of the special committee, which increased the required litigation efforts;

2) The fee-contingent nature of the litigation, in light of the Plaintiffs' successful demonstration that the Defendants breached contractual duties to the Partnership, which would have resulted in extensive damage to the Partnership, but for certain fortuities;

---

[48] *See, e.g., Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *9–10 (Del. Ch. Aug. 30, 2007).

14

3) The substantial therapeutic benefit to the Partnership going forward, as described above;

4) The potential that a monetary benefit in distributions flowed to the Unitholders due to the incentive effects of the Plaintiffs' clarification of the Defendants' duties.

In light of these factors, I find that an all-in award of $4,472,617 is justified.

### III. Conclusion

The parties assert that a proper fee award here will be a beneficial incentive to wholesome levels of entity litigation. In a general sense, that must be the case. Nevertheless, the unique qualities of this peculiar litigation, and its fortuitous outcome, make it unlikely to have specific incentive value; this matter is *sui generis*. In any event, I find that the Plaintiffs are entitled to a fee award of $4,472,617.

To the extent the foregoing requires an order to take effect, it is SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III