**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

J. TRAVIS LASTER
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: May 27, 2016
Date Decided: August 16, 2016

Kurt M. Heyman, Esquire
Samuel T. Hirzel, Esquire
Aaron M. Nelson, Esquire
Proctor Heyman Enerio LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

John L. Reed, Esquire
DLA Piper LLP
1201 North Market Street, Suite 2100
Wilmington, DE 19801

A. Thompson Bayliss, Esquire
Sarah E. Hickie, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Eric Lopez Schnabel, Esquire
Robert Mallard, Esquire
Alessandra Glorioso, Esquire
Dorsey & Whitney (Delaware) LLP
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801

> RE: *Baker v. Sadiq*
> C.A. No. 9464-VCL

Dear Counsel:

The parties settled this case using the transitive property of entity litigation. The parties disagree about how an attorneys' fee award should be determined when the transitive property has been deployed. They consequently part ways on the amount of the award. They also disagree about who should be obligated to pay it.

The transitive property of entity litigation recognizes that a derivative action that asserts claims for breaches of fiduciary duty or violations of the entity's constitutive documents, and an investor class action that asserts similar theories, while conceptually distinct and doctrinally separate, can be functionally equivalent and, therefore,

substitutes. Envision the following scenario. The controller of a privately held entity extracts private benefits from the entity. A minority investor sues derivatively on behalf of the entity to recover the value of the private benefits. If the plaintiff prevails entirely, then the most likely remedy is a monetary recovery by the entity equal to the amount of the private benefits.[1] The entity-level monetary recovery benefits all of the investors indirectly, including the controller, in proportion to their respective equity stakes. The indirect benefit to the minority investors is thus equal to their percentage interest in the entity multiplied by the amount of the entity-level recovery. Given this fact, the controller could make the minority investors whole through a direct cash payment equal to their proportionate share of the entity-level recovery.

This, in a nutshell, is the transitive property. In mathematics, the transitive property states that if A = B, and B = C, then A = C. Transplanted into the world of entity litigation, the transitive property recognizes that an entity-level recovery can be the equivalent of an investor-level recovery and *vice versa*.

Proposition A: The entity receives an entity-level recovery.

Proposition B: The entity-level recovery confers an indirect benefit on the minority investors equal to their percentage interest in the entity multiplied by the value of the recovery.

Proposition C: The minority investors receive an investor-level recovery equal their percentage interest in the entity multiplied by the value of the entity-level recovery.

---

[1] This is a simplification that ignores the alternative possibility of equitable remedies, such as rescission. It also glosses over whether the benefits are to be quantified using an out-of-pocket measure or a rescissory measure.

Through the transitive property, an entity-level recovery can be reframed as an investor-level recovery and *vice versa*.[2]

In Delaware, parties frequently deploy the transitive property to settle derivative actions using investor-level relief.[3] Examples include:

- *In re Clear Channel Outdoor Holdings, Inc. Derivative Litigation.* The plaintiffs sued derivatively, claiming that the parent company of the nominal defendant caused the nominal defendant, pre-IPO, to loan the parent money on excessively favorable terms. Post-IPO, the loan balance continued to grow while the parent company's credit rating decreased. The complaint attacked the defendants' actions in approving the initial loan and allowing the loan balance to balloon. The defendants formed a special litigation committee under *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981), evidencing their view that the claims were derivative. The case was settled by, among other things, having the parent make a partial repayment of $200 million combined with a dividend in the same amount

---

[2] The functional equivalency exists at the snapshot in time when the recovery is achieved. After that, the possible outcomes diverge. The entity-level recovery can be re-deployed by those in charge of the entity, and it may generate positive or negative returns for the entity as a whole, including the minority. The recipients of the investor-level recovery similarly can reinvest the proceeds in projects of their choosing, which may perform better or worse than re-investment by the entity.

[3] By contrast, courts rarely deploy the transitive property to convert what otherwise would be an entity-level recovery into an investor-level recovery. *See In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 132 A.3d 67, 75 (Del. Ch. 2015) ("[S]ubstantial authority supports a court's ability to grant a *pro rata* recover on a derivative claim. Such a recovery is the exception, not the rule, but it is possible."). This is because for an on-going entity, the entity-level remedy is elegantly simple and avoids myriad complexities, such as how to treat changes in investor-level ownership between the time of the wrong and the time of the recovery. *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1046-52 (Del. Ch. 2015). The entity-level recovery also respects the higher priority of other claimants in the capital structure, such as creditors. Given these and other potential issues, courts appropriately have resisted awarding investor-level remedies in derivative actions, reserving their use for cases where an entity-level remedy is no longer feasible, extreme situations involving supervening equities, or the rare circumstance when an investor-level recovery is more efficient. *See El Paso*, 132 A.3d at 122-26 (discussing scenarios in which investor-level recoveries have been awarded).

to the stockholders. Then-Chancellor Strine approved the settlement, noting "[i]t's a derivative action, which is actually, if you think about it, a form of class action" and that "the dividend feature of it, the reduction of the outstanding amount [of the loan] plus the dividend out, in particular to the public stockholders, is a substantial benefit." Settlement Hearing, *In re Clear Channel Outdoor Hldgs., Inc. Deriv. Litig.*, Consol. C.A. No. 7315, at 35, 38 (Del. Ch. Sept. 9, 2013) (TRANSCRIPT).

- *Davis v. Holmes*. The plaintiffs claimed that the defendants violated their fiduciary duties to the nominal defendant corporation by (i) operating the corporation as an unregistered investment company, (ii) paying excessive compensation, (iii) selling substantially all of the corporation's assets, and (iv) engaging in self-dealing. The settlement included the creation of a $3.2 million fund that was distributed to the corporation's unaffiliated stockholders. Vice Chancellor Lamb approved the settlement, observing that the claim was "really a derivative claim" but that the pass-through structure was a "very favorable outcome." Settlement Hearing, *Davis v. Holmes*, C.A. No. 638, at 23 (Del. Ch. June 21, 2006) (TRANSCRIPT).

- *In re Freeport-McMoRan Copper & Gold Inc. Derivative Litigation.* The plaintiffs sued derivatively, claiming that the members of the board of directors of the nominal defendant corporation caused the entity to overpay to acquire a company in which the directors had an interest. The defendants moved to dismiss pursuant to Rule 23.1, evidencing their view that the claims were derivative. While those motions were pending, the parties settled for consideration consisting principally of a gross settlement fund of $137.5 million plus interest that was paid directly to the corporation's stockholders as a special dividend. Vice Chancellor Noble approved the settlement. *See* Settlement Hearing, *In re Freeport-McMoRan Copper & Gold Inc. Deriv. Litig.*, Consol. C.A. No. 8145 (Del. Ch. Apr. 7, 2015) (TRANSCRIPT).

- *Franklin Balance Sheet Investment Fund v. Crowley*. The plaintiffs challenged the defendants' practice of having the nominal defendant entity pay premiums for split-dollar life insurance policies that were owned by the entity's controlling stockholder. The defendants moved to dismiss, relying on derivative standing doctrines such as the continuous ownership requirement and the failure to make demand. *See Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *2 (Del. Ch. Oct. 19, 2006) (reciting procedural history). The case was settled by having the controlling stockholder take the nominal defendant private. *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018 (Del. Ch. Aug. 30, 2007). Only the stockholders who owned stock at the time of the going-private transaction, not those who held stock at the time of the alleged wrongs, received the benefit of the settlement. *Id.* at 5 n.8. The minority stockholders thus received

a remedy for a derivative claim that consisted of their *pro rata* share of the value of the corporation, including some value attributed to the derivative claim. Vice Chancellor Parsons approved the settlement. *Id.*

- *Gerber v. EPE Holdings, LLC*. This settlement resolved two actions. In the first action, the plaintiffs asserted a derivative claim for breach of fiduciary duty arising out of the nominal defendant's acquisition of a related party. In the second action, the plaintiffs asserted direct and double derivative claims after the defendants agreed to a merger that failed to compensate the plaintiffs for their extinguished derivative claims. Both cases were settled in exchange for a direct payment by the defendants to those investors who held units at the time of the merger. Vice Chancellor Noble approved the settlement. *See* Settlement Hearing, *Gerber v. EPE Hldgs. LLC*, C.A. Nos. 5989 & 3543 (Del. Ch. July 1, 2014) (TRANSCRIPT).

Using the transitive property to settle derivative litigation with an investor-level recovery can generate advantages for both sides over a classic entity-level recovery. One plus for the defendants is that the settlement requires less cash, because rather than making a payment to the entity based on the full amount of the private benefits extracted from the entity, they need only fund a percentage of the payment equal to the minority investors' stake. One plus for the plaintiffs is that they get actual cash rather than the indirect benefit of the entity-level recovery. Because of the endowment effect, humans value items that they own or control more highly than items of equal value that they do not own or control. *See generally* Daniel Kahneman, Jack L. Knetsch & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Perspectives 193 (1991). All else equal, humans therefore would prefer to receive and control the proceeds of the recovery themselves, rather than having the entity receive it and someone else control it. The preference for a direct recovery should be particularly strong for investors who believe that the fiduciaries who would control the entity-level

recovery have a history of breaching their fiduciary duties. From the investors' standpoint, the prospect of an entity-level recovery leaves the foxes in charge of the henhouse, so having more chickens in the henhouse isn't nearly as attractive as receiving chickens directly. This is another way of saying that investors who believe their fiduciaries have defalcated in the past will discount the value of an entity-level recovery because of the risk that it may happen again, making the entity-level recovery less valuable to them.

Through a feedback loop, the fact that the plaintiffs place greater value on an investor-level recovery generates reflexive benefits for the defendants. If a direct payment is sufficiently attractive, then the plaintiffs may agree to accept less than their proportionate share of what they would demand in the form of an entity-level recovery. The defendants then need only fund the lesser amount. Still other advantages accrue when a direct payment can be combined with a buyout of the minority's shares. In that scenario, the investors may value the opportunity for exit, and both sides may like the idea of ending a litigious relationship.

All of these advantages increase the possible surplus that can be allocated in a settlement. Moving beyond the zero-sum game of how much the defendants will pay at the entity level thus facilitates the resolution of cases.

But there is a downside for the plaintiffs' lawyers in using the transitive property. Recasting a derivative settlement as an investor-level recovery means a smaller headline benefit, and a smaller headline benefit likely means a smaller fee award. That may not be

a problem if the parties can agree on a fee that the defendants will not oppose, and if the parties also can agree on who will pay it. It becomes a problem if the parties cannot agree on the amount and if there is a dispute about who will pay the fee.

In this case, minority stockholders in Navseeker, Inc. sued derivatively on its behalf. They contended that NavSeeker's controlling stockholder, HIMEX Limited, misappropriated technology assets from NavSeeker worth approximately $25 million (which effectively constituted NavSeeker's entire business). This was not a pie-in-the-sky number. The plaintiffs validated their damages figure by pointing to two past transactions. In July 2013, Quindell PLC purchasd 19% of HIMEX for total consideration worth approximately $13.4 million.[4] In February 2014, Quindell paid approximately $226 million to increase its stake in HIMEX to 85%.[5] The plaintiffs also pointed to a proposal by Quindell to buy out NavSeeker's employee stockholders based on an implied valuation of $25 million. Quindell later proposed to buy all of NavSeeker's assets for $20 million.

Rather than litigating the case through trial, the parties used the transitive property to achieve a settlement. The specific terms of the settlement were as follows:

---

[4] Quindell is a British firm. It paid £1,800,000 in cash plus 64,800,000 marketable shares of Quindell stock valued at £6,900,000. At then-current exchange rates, the cash was worth roughly $2,738,520 and the stock worth roughly $10,598,072.

[5] In this transaction, Quindell purchased additional equity in HIMEX in return for £23,000,000 in cash plus 324,000,000 marketable shares of Quindell stock valued at £115,000,000. At then-current exchange rates, the cash was worth roughly $37,545,200 and the stock worth roughly $188,338,150.

1.  HIMEX, Quindell and/or Individual Defendants and/or their insurance carriers (the "Funding Parties") shall make a $2,750,000 Cash Payment to NavSeeker for the purpose of buying out the Minority Stockholders. Settlement §§ 1.19, 2.1-2.4.

2.  HIMEX will discharge $500,000 of NavSeeker debt. *Id.* § 2.3.

3.  The effectiveness of the Settlement is contingent upon acceptance of the proposed Stock Purchase Agreement by all Plaintiffs, but not on acceptance of the proposed Stock Purchase Agreement by any other Minority Stockholder. *Id.* § 2.4.

4.  All Parties stipulate that the efforts of Plaintiffs' Counsel have conferred a benefit on NavSeeker of at least $2,750,000. Plaintiffs' Counsel reserve all rights to argue that the amount of the benefit exceeded that amount, and Defendants reserve all rights to oppose any such argument. *Id.* § 6.5.

5.  Plaintiffs (on their own behalves and derivatively on behalf of NavSeeker), Plaintiffs' Counsel, NavSeeker, and every Participating NavSeeker Stockholder shall have and by operation of the Judgment shall be deemed to have fully, finally, and forever released, relinquished, and discharged the Released Defendants from any and all of the Released Claims—which, importantly, includes individual claims. *Id.* § 3.1(a).

6.  The Released Defendants shall provide reciprocal releases to Plaintiffs and all participating Minority Stockholders. Settlement §§ 1.15, 3.2.

7.  Minority Stockholders who do participate in the Settlement will not be deemed to release anything other than derivative claims.[6]

The parties did not agree on the amount of a fee award to plaintiffs' counsel, the size of the benefit conferred by the settlement, or who would pay the fee.

The settlement that the parties reached is a classic example of the transitive property at work. The underlying derivative claim sought damages of $25 million. The minority stockholders who were not affiliated with the defendants owned 10.75% of NavSeeker's equity. Had they prevailed at trial, they would have benefitted, indirectly, to

---

[6] This aspect is moot because all minority stockholders elected to participate.

the tune of $2,687,500 from a corporate level recovery. Through the settlement, the minority investors received consideration of $2,750,000 in the form of a buyout.

For virtually all of the parties involved, the stockholder-level settlement was a superior outcome. The controllers only had to come up with $2.75 million instead of $25 million. The minority investors got real cash instead of an indirect increase in the value of their shares. Plus they were able to exit from a controlled company where they contended the controllers were engaging in wholesale misappropriation. And both sides severed a troubled relationship and put an end to the burdens of litigation.

But the picture wasn't so good for plaintiffs' counsel. Instead of being able to claim a corporate level benefit of $25 million, plaintiffs' counsel obtained a corporate level benefit of $3.25 million (consisting of $2.75 million to fund the buyout plus $500,000 in debt forgiveness).[7] The picture was even worse because the natural party to pay the fee award was NavSeeker, who, according to the plaintiffs, had been stripped of its assets and had no cash, and whose controllers were providing just enough funding, through secured debt, to meet current bills. If plaintiffs' counsel sought to enforce their rights as creditors, they would find themselves in a position junior to the secured debt owed to NavSeeker's controllers. A fee award for plaintiffs' counsel therefore would

---

[7] Plaintiffs' counsel might be able to claim to have conferred a separate stockholder level benefit in the form of the liquidity and exit, but that benefit would call for a fee award from the minority stockholders, not from NavSeeker, and plaintiffs' counsel has not sought it here.

amount to an invitation to negotiate with NavSeeker over the amount of the haircut that plaintiffs' counsel would have to accept before seeing any cash at all.

Facing this conundrum, plaintiffs' counsel agreed to the settlement, but reserved the right to litigate the aggregate amount of the benefit conferred, the amount of the fee award, and who would pay it. Plaintiffs' counsel then filed a fee petition in which they sought an award of $6 million plus expenses. To support the award, plaintiffs' counsel argued that the fee award should be based on the implied derivative recovery rather than the re-cast stockholder-level settlement. Recognizing that NavSeeker lacked the cash to pay that amount (or any amount), plaintiffs' counsel argued that the defendants should be held jointly and severally liable for the amounts awarded. Plaintiffs' counsel contended that all of the defendants benefitted from the settlement and should therefore bear the cost.

Although plaintiffs' counsel could not identify a specific precedent for their request, they cobbled together cases that provided indirect support. They also advanced a policy argument. They observed that as fiduciaries pursuing this litigation in a representative capacity, they had little choice but to support the settlement, which was more favorable than the best possible outcome that their clients could achieve through the litigation. Yet their fiduciary obligation to support the settlement ran against their personal interest in continuing to litigate the derivative claim to (i) generate a larger recovery that would support a more meaningful fee award and (ii) obtain the types of post-trial factual findings that would support holding other defendants liable for paying it.

Plaintiffs' counsel have pointed out that if they cannot obtain a meaningful recovery against a solvent defendant, then future lawyers will anticipate this Catch-22 and decline to represent minority stockholders in similar scenarios. Those situations, involving small companies and large-scale acts of expropriation, are in turn the cases where enforcement mechanisms are most needed.

Plaintiffs' counsel has identified a problem, and I do not claim to have a solution. Based on the present posture of the litigation and the current state of the record, I am not in a position to impose liability for a fee on any party other than NavSeeker. One could envision some type of post-settlement proceeding to determine whether grounds exist to impose fee liability on NavSeeker's controllers, but that route appears unprecedented. It also would embroil the parties in precisely the type of litigation that they reached a settlement to avoid.

Based on the present posture of the litigation and the current state of the record, I am not able to value the benefit conferred at any amount greater than $3.25 million. It is true that the equivalent derivative recovery would be an order of magnitude greater, but the parties used the transitive property to achieve a stockholder-level settlement, not a derivative settlement. In the converse situation, where a plaintiff has achieved a full-blown derivative recovery, this court has not reduced the size of the benefit conferred to account for the controller's ownership stake and the much smaller benefit that inures indirectly to the minority. *See In re S. Peru Copper Corp.*, 2011 WL 6866900 (Del. Ch. Dec. 29, 2011) (ORDER) (granting fee award on full amount of the derivative judgment

even though the controlling stockholder would receive 82% of the benefit), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012); *Carlson v. Hallinan,* 925 A.2d 506, 546-48 (Del. Ch. 2006). These decisions suggest that formal structure matters.

The present task is to determine a fee award for plaintiffs' counsel. When awarding fees, the Court of Chancery "must make an independent determination of reasonableness." *Goodrich v. E.F. Hutton Gp.*, 681 A.2d 1039, 1046 (Del. 1996). The court considers the factors laid out in *Sugarland* when determining the amount of a reasonable award. *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149-50 (Del. 1980). Although the factors appear diffusely throughout the *Sugarland* opinion, *see id.*, the Delaware Supreme Court recently summarized them as follows: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved." *Ams. Mining*, 51 A.3d at 1254.

The Delaware Supreme Court noted in *Americas Mining* that "Delaware courts have assigned the greatest weight to the benefit achieved in litigation." *Id.* Later in that decision, the Delaware Supreme Court reiterated that "our holding in *Sugarland* assigns the greatest weight to the benefit achieved in the litigation" and instructed that "[w]hen the benefit is quantifiable, . . . *Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit." *Id.* at 1259. After surveying a range of precedent, the Delaware Supreme Court observed that "Delaware case law supports a wide range of

reasonable percentages for attorneys' fees, but 33% is the very top of the range of percentages." *Id.* (citation and internal quotation marks omitted). The Delaware Supreme Court then provided guidance on how this court should approach the percentage-of-benefit analysis by first noting with approval that this court "has a history of awarding lower percentages of the benefit where cases have settled before trial" and then grouping the percentages into categories based on the stage at which the litigation settled:

> When a case settles early, the Court of Chancery tends to award 10-15% of the monetary benefit conferred. When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee awards in the Court of Chancery range from 15-25% of the monetary benefits conferred. . . . Higher percentages are warranted when cases progress to a post-trial adjudication.

*Id.* at 1259-60 (citations omitted). Selecting an appropriate percentage requires an exercise of judicial discretion. *Id.* at 1261.

Because of the manner in which the settlement was structured, the maximal benefit that plaintiffs' counsel can claim to have conferred is $3.25 million (consisting of $2.75 million to fund the buyout plus $500,000 in debt forgiveness).

The case did not involve significant discovery, but it did involve meaningful litigation efforts, primarily because of serial reversals of position by the defendants and repeated efforts by the plaintiffs to combat them. The litigation was also relatively more complex due to the presence of foreign defendants and the involvement of the Department of Labor, which was concerned about misconduct relating to NavSeeker's

management of its 401K plan. Under the circumstances, an award of 20% of the benefit is warranted. That amount equates to $650,000.

Plaintiffs' counsel pursued the litigation on a contingent basis. Counsel has averred that if plaintiffs had billed this matter on an hourly basis they would have billed fees of over $390,000. A fee award of $650,000 is not excessive by that measure. Defendants' counsel billed over $2,000,000. By comparison to that figure, the fee award is low.

Counsel are experienced in corporate litigation in Delaware and well-known to the court. Their involvement fully justifies the amount of the fee sought.

Plaintiffs' counsel is awarded fees and expenses of $650,000 from NavSeeker. No other party is liable for the judgment.

Sincerely yours,

/s/ J. Travis Laster

J. Travis Laster
Vice Chancellor

JTL/krw