# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DELL TECHNOLOGIES INC. CLASS V STOCKHOLDERS LITIGATION | §<br>§<br>§<br>§<br>§<br>§ | No. 349, 2023<br><br>Court Below: Court of Chancery<br>of the State of Delaware<br><br>C.A. No. 2018-0816 |

Submitted: May 15, 2024
Decided: August 14, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices; constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Stephen B. Brauerman, Esquire (*argued*), Sarah T. Andrade, Esquire, BAYARD, P.A., Wilmington, Delaware *for Objector Below, Appellant Pentwater Capital Management LP*.

Ned Weinberger, Esquire (*argued*), Mark Richardson, Esquire, Brendan W. Sullivan, Esquire, LABATON SUCHAROW LLP, Wilmington, Delaware; Domenico Minerva, Esquire, Joseph Cotilletta, Esquire, LABATON SUCHAROW LLP, New York, New York; David M. Cooper, Esquire, Silpa Maruri, Esquire, George T. Phillips, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; William R. Sears, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California *for Co-Lead Counsel for Appellee.*

Peter B. Andrews, Esquire, Craig J. Springer, Esquire, David M. Sborz, Esquire, Jackson E. Warren, Esquire, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Chad Johnson, Esquire, Noam Mandel, Esquire, Desiree Cummings, Esquire, Robert Gerson, Esquire, Jonathan Zweig, Esquire, ROBBINS GELLER RUDMAN & DOWD LLP, New York, New York; Jeremy S. Friedman, Esquire, David F.E. Tejtel, Esquire, Christopher M. Windover, Esquire, Lindsay La Marca, Esquire, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York *for Additional Counsel for Appellee*.

Anthony A. Rickey, Esquire, MARGRAVE LAW LLC, Wilmington, Delaware *for Amici Curiae, Law Professors, in support of Appellant*.

Joel Friedlander, Esquire, Jeffery M. Gorris, Esquire, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware *for Amici Curiae, Professors Lynn A. Baker, Brian T. Fitzpatrick and Charles Silver, in support of Appellee*.

**SEITZ**, Chief Justice:

This is an appeal from a final judgment of the Court of Chancery awarding counsel fees and expenses and an incentive award of 26.67% of a $1 billion settlement, or $266.7 million. The settlement and fee award followed years of contentious litigation challenging Dell Technologies' redemption of Class V stock for what the plaintiff claimed was an unfair price.

Pentwater Capital Management LP and other class members objected to the amount of the fee award. In a thoughtful opinion, the Court of Chancery declined to apply a declining percentage to the fee award. It also found that the $1 billion settlement was a significant achievement, and no other factors warranted reducing the percentage of fees awarded from the recovery. After our careful review, we find that the Court of Chancery did not exceed its discretion in setting the fee percentage and affirm its judgment.

I.

A.

We recite the facts from the settlement record and the Court of Chancery's decision awarding attorneys' fees.[1] In 2013, Michael Dell and Silver Lake Group LLC took Dell, Inc. private through a leveraged buyout. Mr. Dell and Silver Lake

---

[1] *In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679 (Del. Ch. 2023), *as revised* (Aug. 21, 2023) [*Dell II*].

3

controlled the successor company, Dell Technologies, Inc. After the take-private transaction closed, Dell Technologies set its sights on EMC Corporation, a publicly traded data-storage firm which held an 81.9% equity stake in VMWare, also publicly traded. Dell and Silver Lake would have preferred to purchase EMC on an all-cash basis, but Dell Technologies was already highly leveraged after the take-private transaction. Dell Technologies ended up acquiring EMC with a combination of cash and newly authorized Class V Dell Technologies stock. Shares of Class V stock traded publicly. After the acquisition, it was thought that the Class V shares would track at little to no discount to the trading price of VMWare's common stock.

Dell Technologies and EMC completed the $67 billion transaction. Each share of EMC common stock converted into the right to receive $24.05 in cash and 0.11146 of a Class V share. Post-acquisition, the Class V shares traded at a 30–50% discount to VMware's publicly traded stock. According to the Court of Chancery, the Class V shares traded at a discount because, in part, Dell Technologies held an option to force a conversion of the Class V shares into Class C shares through an opaque formula that could be applied subjectively.[2]

Dell Technologies saw an opportunity to capture the value of the Class V stock discount by consolidating its VMWare ownership. It had three apparent options: (i) a transaction with VMWare; (ii) a negotiated redemption of the shares

---

[2] *Id.* at 688.

of Class V stock; or (iii) a forced conversion of the shares. Dell Technologies retained The Goldman Sachs Group, Inc. to advise them on the consolidation. According to the plaintiff, Goldman advised Dell Technologies that the Class V market discount could be widened further by creating market uncertainty about whether the company would force a conversion of the Class V stock. When the financial press reported that Dell Technologies was considering an IPO of its Class C stock, the plaintiff alleged, the Class V stock discount increased to over 45%.

After the financial press reported on the possible Class C stock IPO, the Dell Technologies board formed a special committee to negotiate the redemption of the Class V stock.[3] The committee lacked the power to block either a public listing of the Class C stock or a forced conversion.

As negotiations ensued, Dell Technologies and its advisors were alleged to have pressured the committee by making clear that they would consider alternatives to a negotiated redemption. The committee and Dell Technologies eventually arrived at a deal that valued the Class V stock at $109 per share – a 32.7% discount to VMWare's trading price. Stockholders objected and Dell abandoned the committee process. Instead, it entered into non-disclosure agreements and

---

[3] David Dorman, William Green, and Ellen Kullman were the initial special committee members. Kullman was also a Goldman Sachs director. *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *4 (Del. Ch. June 11, 2020) [*Dell I*]. Early on, Kullman identified the conflict with Dell's advisor and recused herself. *See id.* at *7, *13.

negotiated separately with six investment funds who held a large block of Class V stock.

Eventually, Dell Technologies arrived at an agreement with the funds. In exchange for their Class V stock, Dell Technologies agreed to offer the funds the option to receive (i) shares of newly issued Class C common stock valued at $120 per share; or (ii) $120 per share in cash, with the aggregate amount of cash capped at $14 billion. The deal valued the Class V stock at $23.9 billion. Dell informed the committee of the negotiated redemption's terms. The committee approved the same terms for the remaining Class V stockholders after meeting for an hour. Sixty-one percent of the unaffiliated Class V stockholders voted to approve the redemption.

B.

Former Class V stockholders filed putative class actions, which were consolidated by the Court of Chancery. The lead plaintiff, Steamfitters Local 449 Pension Plan, filed a Verified Amended Consolidated Stockholder Class Action Complaint on behalf of the plaintiff and all similarly situated former holders of Class V stock. The complaint brought direct claims for breach of fiduciary duty against Mr. Dell, Silver Lake, and other Dell Technologies directors and sought damages for the unfair redemption of Class V stock.

The complaint alleged that the director defendants breached their fiduciary duties by approving the redemption, coercing the Class V stockholders to vote in

6

favor of the redemption, and for making materially false and/or misleading proxy statements. Further, the plaintiff claimed that Mr. Dell and Silver Lake, as Dell Technologies' controlling stockholders, breached their fiduciary duties by causing the company to enter an unfair redemption and by consummating the redemption at the negotiated price.

The defendants moved to dismiss the complaint. They argued that the transaction was approved by a well-functioning independent committee of directors and the affirmative vote of fully informed and uncoerced minority stockholders. They contended that, under *Kahn v. M & F Worldwide Corp.*, the transaction should be subject to the deferential business judgment rule standard of review.[4] The court denied the motion. It held that the plaintiff had sufficiently alleged that the two-member special committee was not wholly independent, making entire fairness the operative standard of review.[5]

The plaintiff later amended its complaint twice, adding various Silver Lake affiliates as defendants. The amended complaint alleged that, throughout the redemption, Mr. Dell, Silver Lake, and Silver Lake affiliates were the controlling stockholder group of Dell Technologies. The plaintiff also added Goldman Sachs

---

[4] 88 A.3d 635, 639 (Del. 2014) [*MFW*], *overruled on other grounds by Flood v. Synutra, Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[5] *Dell I*, 2020 WL 3096748.

7

as a defendant, alleging that they knowingly aided and abetted the fiduciary breaches of the control group and the director defendants.

For the next two and a half years, the plaintiff pursued the case through discovery. The parties stipulated to class certification, which was approved by the court. They completed both fact and expert discovery. After expert discovery closed, the parties at first unsuccessfully mediated the dispute. The court set a trial date. As trial approached, the parties filed a pre-trial order. The trial would involve testimony from fourteen fact witnesses and three expert witnesses. The parties listed 2,887 joint trial exhibits.[6] After the parties filed their pre-trial briefs, the mediator asked the parties to consider a mediator's proposal. The mediator proposed a settlement of $1 billion in cash, which both sides accepted, subject to court approval. The Class V stockholders were notified of the proposed settlement. No one objected.

Class counsel sought 28.5% of the $1 billion settlement as a fee and expenses, translating into a $285 million fee award – the second largest attorneys' fee ever awarded by the Court of Chancery.[7] Pentwater Capital Management L.P. filed an

---

[6] App. to Appellant's Opening Br. at A328, *Dell II* [hereinafter "A__"].

[7] A296.

objection.[8]  Seven other investment funds joined the fee objection.  All told, the objectors owned about 24% of the class.[9]

Pentwater argued that awarding a percentage of the settlement sought without considering the size of the settlement was unfair to the class.  They contended that, in this case, the proposed fee was disproportionate to the value of the settlement.  The objectors urged the court to apply a declining percentage to the fee award, which is similar to the approach used by federal courts in large federal securities law settlements.  The declining percentage method reduces the percentage of the fee awarded to counsel as the size of the recovery increases.  According to Pentwater, fee awards "are meant to reasonably incentivize the attorneys taking these cases," and, in its view, "the amount of work, time, and effort spent on a case does not grow proportionately with the transaction size."[10]  In other words, "it is not a hundred times more difficult (or riskier) to litigate and try a $10 billion case than it is to litigate and try a $100 million case."[11]  They argued that the Delaware Supreme Court and Court of Chancery have applied the declining percentage method in other cases.[12]

---

[8] A367–84.

[9] A367.

[10] A372.

[11] *Id.*

[12] *Id.* (citing *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012)).

Finally, they contended that the benefit achieved by counsel in this case did not merit such a substantial fee. Although the $1 billion figure is large, Pentwater claimed that the recovery was only a small fraction of what could have been achieved if counsel had tried the case to judgment. Before the settlement hearing, the court asked the objectors to provide, among other things, information about their annual management fees and performance fees.[13] The court also solicited the views of the academic community. Five law professors filed an amicus brief in support of the objectors' position.[14]

## C.

In a carefully considered opinion, the Court of Chancery awarded counsel 26.67% of the settlement, or $266.7 million.[15] At the outset, the court observed that the Supreme Court's seminal decision in *Sugarland Industries, Inc. v. Thomas* governs fee awards in representative actions.[16] As the Vice Chancellor noted, when the court considers a fee application, the court should review: (1) the results achieved; (2) the time and effort of counsel; (3) the relative complexities of the litigation; (4) any contingency factor; and (5) the standing and ability of counsel

---

[13] A450–52.

[14] A478–98.

[15] *Dell II*, 300 A.3d at 735. The court also included expenses and an incentive fee for the plaintiff. For ease of reference, we will simply refer to the total amount as the fee award. Pentwater did not object to the expense amount or the incentive fee.

[16] *Id*. at 692 (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149–50 (Del. 1980)).

involved.[17]  The court also observed that the results achieved is the primary factor for consideration.  The hours worked, according to the court, should be used "as a cross-check to guard against windfall awards, particularly in therapeutic benefit cases."[18]

1.

As expected, much of the court's decision focused on the results achieved.[19] The court first pointed out that the benefit accruing to the class was extraordinary: $1 billion.[20]  Next, it examined what percentage of that amount should be awarded to counsel because of their work.  The court looked to this Court's precedent and precedent of the Court of Chancery to set litigation-stage percentages.  Taking the lead from *Americas Mining*, it observed that, when the benefit is quantifiable and the litigation settles in the late stage of the litigation but before trial, the resulting fee award is usually 25–30% of the settlement.[21]  According to the court, other *Sugarland* factors can cause the court to adjust the base percentage.[22]  There were also no causation issues as the plaintiff's counsel was the sole cause of the benefit.

---

[17] *Id.* (quoting *Ams. Mining*, 51 A.3d at 1254).

[18] *Id.* (quoting *Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011)).

[19] *Id.* at 692–726.

[20] *Id.* at 693.

[21] *Id.* at 699.

[22] *Id.* at 692; *see also* 726–28 (discussing the other *Sugarland* factors).

The court reasoned that the plaintiff completed all pre-trial activities, but not the trial itself or post-trial work. Under what it termed the "stage-of-case" method, the plaintiff's counsel was presumptively entitled to a baseline award of 26.67% – one third through the late-stage range percentage.[23] In lowering the presumptive amount from 28.5% to 26.67%, the court reasoned that 28.5% for this stage of the case settlement would impact the relative award available for taking a case through trial. It would also interfere with the balance of incentives in the fee award process.[24]

Next, the court considered the objectors' request to lower the percentage based on the size of the award. The objectors proposed that the court adopt the declining-percentage method. They argued that larger settlements should result in smaller percentage fees to prevent windfalls to counsel at the expense of the class.[25] The declining percentage approach is used often in federal securities law cases, where settlements of $1 billion or more typically see fee awards around 10–12% regardless of the stage of proceedings.

The court declined to adopt a declining percentage approach because it did not align with Delaware precedent. According to the court, "[u]nder *Americas Mining* and *Sugarland*, a court does not make a downward adjustment to the

---

[23] *Id.* at 699–700.

[24] *Id.*

[25] *Id.* at 700–01.

indicative percentage based on the size of the fund."[26]  The court disagreed with the objectors that, in *Goodrich v. E.F. Hutton Grp., Inc.*, the Supreme Court endorsed the federal declining percentage approach.[27]  And in *Americas Mining*, the court observed, this Court rejected a mandatory declining-percentage approach, and instead endorsed the multi-factor *Sugarland* test.  As the court held, the declining-percentage approach was a covert return to the lodestar method, which this Court considered and rejected in *Sugarland*.[28]

The court then examined various Court of Chancery decisions relied on by the objectors and concluded that none stood for use of the percentage reduction in megafund cases.  Instead, the court held, the cases were all "straightforward" applications of *Sugarland*.[29]  When it reviewed the Court of Chancery's decision in *Americas Mining*, the court observed that, even though the court awarded 15% of the judgment, it did not base the percentage solely on the size of the award.[30]

Next, the court compared Delaware as a forum for corporate litigation with federal securities litigation, where the declining percentage method has been

---

[26] *Id.* at 703–04.

[27] *Id.*

[28] *Id.* at 687.

[29] *Id.* at 703.

[30] *Id.* ("The objectors regard this as an endorsement of the declining-percentage approach, but it actually reflects the Chancellor's consideration of all of the *Sugarland* factors, including the plaintiff's delay in prosecuting the case.  Elsewhere in the transcript, the Chancellor criticized the concept of a reduction in mega-fund cases.").

employed.[31]  According to the court, federal cases, governed by Rule 10b-5 and other federal statutes, often involve higher volumes and larger recoveries, and focus primarily on monetary damages.  In contrast, Delaware M&A litigation centers on fiduciary duties and corporate governance, with settlements that might not always involve substantial financial awards.

The court reviewed a variety of differences between the two systems that could justify a different treatment for fee awards.[32]  In the end, the court determined that the reasons that could justify a megafund reduction did not apply to this case.[33]  The court held that "[t]he risk of a non-recovery in this case (at trial or on appeal) was significant, and the risk intensified as trial approached.  The recovery of $1 billion does not seem to have been the product of deal size."[34]  The court concluded that "[t]he rationales for using the declining-percentage method in federal securities litigation have not been shown to apply to Chancery M&A litigation" and "do not apply to this case."[35]  The court did not adjust the percentage based on the size of the settlement.[36]

---

[31] *Id.* at 704.

[32] *Id.* at 704–15.

[33] *Id.* at 715.

[34] *Id.*

[35] *Id.*

[36] *Id.*

The court next examined market practice in privately negotiated contingency fee arrangements.[37] According to one study, the majority of private fee agreements used fixed or increasing percentage arrangements, rather than a declining percentage approach.[38] The study found that clients in pharmaceutical antitrust and patent litigation frequently accept fixed percentages around one-third of the recovery, consistent with the fee structures seen in high-stakes litigation.[39] According to the court, clients either paid a fixed percentage or an increasing percentage as the stage of litigation progressed.[40] The plaintiff's counsel also provided the court with information about their fee agreements.[41] Most agreements did not use a declining percentage approach.[42] The court held that market practice did not justify a departure from *Americas Mining* by adopting a declining percentage approach.[43]

Further, the court criticized the objectors for advocating for a reduced fee percentage when, as fund managers, they agreed that they do not use similar

---

[37] *Id.* at 715–16 (citing Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1141 (2021) [hereinafter "*Judge's Guide*"]).

[38] *Id.* (citing *Judge's Guide*, at 1170).

[39] *Id.* at 716 (citing *Judge's Guide*, at 1161).

[40] *Id.* The court cited another study which found similar results. *Id.* at 717 (citing David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335 (2012)).

[41] *Id.* at 717–18.

[42] *Id.*

[43] *Id.*

arrangements in their risk-based business.[44]  According to the court, even though the fee agreements are not negotiated in class action litigation, [t]he lack of negotiation is not a distinction" and "[t]he absence of an *ex ante* agreement is what forces the court to consider other sources of market evidence . . . ."[45]  The court held that the objectors chose to "free ride" and "[t]he settlement was a windfall for the objectors because they did nothing to create it."[46]  The court expressed its antipathy for the objectors' position by stating that the objectors' position "masks self-interest with an appeal to equity" and that "envy is not a sound basis for reducing a fee award."[47]

The court also refused to credit the objectors' argument that the settlement did not confer a substantial benefit on the class even though it was the second largest recovery ever achieved in Delaware.[48]  The objectors argued that the plaintiff's counsel sought damages of $10.7 billion.  By settling for only 9.3% of the maximum recovery, they argued, counsel settled for too little.[49]  The court disagreed, finding that the recovery here was four times larger than the next largest class recovery.  And

---

[44] *Id.* at 718–20.

[45] *Id.* at 719.

[46] *Id.* at 720.

[47] *Id.* (citing *In re Clear Channel Outdoor Holdings Inc., Deriv. Litig.*, 2013 WL 5563370 (Del. Ch. Sept. 9, 2013), tr. at *19; *In re S. Peru S'holder Litig.*, 2011 WL 7121732 (Del. Ch. Dec. 19, 2011), tr. at *82).

[48] *Id.* at 725.

[49] *Id.* at 721.

the court observed that, when adjusted for risk, the common fund was an exceptional result for the class.[50]

The court examined other settlement data, comparing the settlement against the maximum damages of each sample case and the percentage of equity value of the respective deal.[51]  Of the cases reviewed, the data showed a median settlement of 16.5% of maximum damages and 2.95% for equity value of the deal.[52]  Despite appearing less impressive as a percentage of maximum damages (9.34%), the court found that the settlement ranks highly when considering the equity value of the transaction (4.18%).[53]  Thus, the court held, "[p]laintiff's counsel achieved an unprecedented result and deserve the full percentage that the stage-of-case method supports."[54]

In sum, the court determined that *Americas Mining* favored a "stage of case" approach and not a declining percentage approach, and that none of the evidence presented by the objectors or *amici* should lead the court to apply a declining percentage approach in this case.

---

[50] *Id.* at 723.

[51] *Id.* at 724–25.

[52] *Id.*

[53] *Id.* at 725.

[54] *Id.* at 725–26.

## 2.

The court concluded its decision by reviewing the remaining *Sugarland* factors. It found that none warranted a reduction in the percentage award.[55] According to the court, the plaintiff's counsel worked on a fully contingent basis,[56] expended 53,000 hours litigating the case,[57] faced nearly 100 attorneys from prestigious firms,[58] addressed complex legal and factual issues,[59] and were of good standing in the legal community.[60] Finally, the court rejected the objectors' argument that counsel should have structured the settlement to pay the attorneys' fees award separately.[61] The court found that the weight of authority supports awarding fees from the common fund in the class setting.[62]

## D.

On appeal, Pentwater claims that the court erred in three ways. First, Pentwater argues that the court should not have awarded attorneys' fees based on a percentage of the settlement fund without considering the size of the fund. Pentwater

---

[55] *Id.* at 726–28.

[56] *Id.* at 726–27.

[57] *Id.*

[58] *Id.* at 727.

[59] *Id.* at 728.

[60] *Id.*

[61] *Id.*

[62] *Id.* at 730.

argues that the Court of Chancery ignored our *Americas Mining* decision by employing a "stage-of-case" analysis without considering the actual result in a megafund case – the court affirmed a 15% award for a case that, unlike here, was decided after trial. Pentwater asks this Court to adopt the federal declining percentage method for megafund cases as a way to prevent windfalls to counsel.

Next, Pentwater argues that the court misapplied the first two *Sugarland* factors – the results achieved and the time and effort of counsel. For the former, Pentwater repeats its argument that the recovery was a small fraction of what could have been obtained after trial. They contend that the court should have considered how the result achieved compared to what counsel could otherwise have obtained after trial. Regarding the time and effort factor, Pentwater faults the court for not giving greater weight to a cross-check of the fee award's implied hourly rate of $5,000 per hour. Pentwater argues that the fee is seven times counsel's customary rate, resulting in an award at the high end of fee awards in the Court of Chancery.

Finally, Pentwater contends that the court erred when it considered Pentwater's compensation structure in the fee inquiry. It argues that the objectors and their private arrangements are irrelevant to the fee inquiry. Pentwater also claims that intrusive discovery aimed at objectors will discourage good faith objections to fee awards.

19

We review the reasonableness of the percentage awarded from a common fund to class counsel by the Court of Chancery to decide whether the court exceeded its discretion.[63] Errors of law are reviewed *de novo*.[64]

## II.

In Delaware, litigants typically pay their own attorneys' fees.[65] There are exceptions to the rule – bad faith assertion of claims, statutory and contractual fee shifting, and in equity.[66] In equity, under the "common fund" exception, if a party creates a common fund for the benefit of others, attorneys' fees can be paid from the common fund.[67] The common fund exception is "founded on the equitable principle that those who have profited from litigation should share its costs."[68] Spreading the costs over all common fund beneficiaries eliminates the free-rider problem – reaping the gains without sharing the expenses that created the common fund.[69]

---

[63] *Id.* at 694–95 (citing *Ams. Mining*, 51 A.3d at 1260).

[64] *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006) ("Where it is in issue, we review the [trial court's] formulation of the appropriate legal standard *de novo*."); *see also Gannett Co. v. Bd. of Managers of the Del. Criminal Just. Info. Sys.,* 840 A.2d 1232, 1240 n.25 (Del. 2003).

[65] *Maurer v. Int'l Re-Ins. Corp.*, 95 A.2d 827, 830 (Del. 1953).

[66] *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996).

[67] *Id.*

[68] *Id.* (citing *Maurer*, 95 A.2d at 830).

[69] *Id.* (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). Under the Delaware Lawyers' Rules of Professional Conduct, the fee must be reasonable. *See* Del. Lawyers' R. Prof'l Conduct 1.5(a).

When a judgment or settlement creates a common fund, counsel may apply to the court for an award of attorneys' fees and expenses from the fund.[70] As fiduciaries for the class and under professional conduct rules, counsel's fee request must be reasonable.[71] Even with equitable and professional constraints, an inherent conflict still arises between the class members and their attorneys.[72] The more the attorneys receive, the less goes to the class. As such, the reviewing court – here the Court of Chancery – has an essential role to play to evaluate a fee application and to set a fair and reasonable fee.[73] The court's task is not cursory.[74] As we have said, "a request for an award of attorney's fees from a common fund must be subjected to the same heightened judicial scrutiny that applies to the approval of class action settlements[,]" and "the Court of Chancery must make an independent determination of reasonableness on behalf of the common fund's beneficiaries, before making or approving an attorneys' fee award."[75]

---

[70] *Goodrich*, 681 A.2d at 1045.

[71] *Id.*

[72] *Id.* at 1045 (citing *Rawlings v. Prudential–Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985)).

[73] *Sugarland*, 420 A.2d at 153 (Del. 1980).

[74] *Goodrich*, 681 A.2d at 1045–46 (citing *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del. 1989)).

[75] *Id.* Although a fee award request requires intensive review, it is common, in the interests of efficiency, for the Court of Chancery to address fee awards in transcript rulings.

In *Sugarland v. Thomas*, this Court affirmed the Court of Chancery's decision that the counsel in a derivative case were "entitled to a fair percentage of the benefit inuring to Sugarland and its stockholders."[76] We looked to five factors that are now the yardstick to measure whether a fee award is "reasonable": (1) the results achieved; (2) the time and effort of counsel; (3) the relative complexities of the litigation; (4) any contingency factor; and (5) the standing and ability of counsel involved.[77] The first factor – the results achieved – is paramount. The court must also consider the degree of the "cause and effect" between what counsel accomplished through the litigation and the ultimate result.[78]

We also rejected the federal lodestar approach. This approach takes the time expended by counsel and multiplies it by an approved hourly rate. The result can be adjusted based on case-specific factors.[79] We concluded that adopting the loadstar approach would require the Court of Chancery to engage in "elaborate analyses" when the existing practice was sufficient.[80] In other words, instead of adopting a

---

[76] *Sugarland*, 420 A.2d at 150 (Del. 1980).

[77] *Id.* at 149.

[78] *Id.* at 150–51 (discussing that counsel is entitled to only 5% of the benefit achieved because the final sale price was influenced by factors beyond the initial bids and not caused by the petitioners' actions).

[79] *Id.* at 150 (citing *Lindy Bros. Builders of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973)).

[80] *Id.*

formulaic approach to fee requests, we committed the fee award to the discretion of the Court of Chancery.

In *Goodrich v. E.F. Hutton Grp., Inc.*, we reiterated that the Delaware courts would not follow the federal lodestar method.[81] Instead, we reaffirmed that *Sugarland*'s multi-factor approach is the appropriate inquiry for an equitable award of attorneys' fees from a common fund.[82] At the same time, we also noted that the Court of Chancery correctly "acknowledged the merit of the emerging judicial consensus that the percentage of recovery awarded should 'decrease as the size of the fund increases.'"[83] We concluded, however, that:

> [t]he adoption of a mandatory methodology or particular mathematical model for determining attorney's fees in common fund cases would be the antithesis of the equitable principles from which the concept of such awards originated. . . . New mechanical guidelines are neither appropriate nor needed for the Court of Chancery.[84]

---

[81] 681 A.2d 1039 (Del. 1996).

[82] *Id.* at 1049 (rejecting a federal rule that awarded attorneys' fees as a percentage in relation to the maximum common fund available, without regard to what benefits were realized by class members).

[83] *Id.* at 1048 (citing report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. at 256). *See Seinfeld v Coker*, 847 A.2d 330, 335–36 (Del. Ch. 2000) ("The Delaware courts have often considered methods employed by other courts. For example, the *Goodrich* Court discussed the percentage of the fund method, noting that the Court of Chancery rightly 'acknowledged the merit of the emerging judicial consensus that the percentage of recovery awarded should 'decrease as the size of the fund increases.'' But that Court also stressed that '[t]his case establishes, once again, that the Court of Chancery's existing multiple factor approach to determining attorney's fee awards remains adequate for purposes of applying the equitable common fund doctrine.'" (citations omitted)).

[84] *Goodrich*, 681 A.2d at 1050 (citing *Trustees v. Greenough*, 105 U.S. 527 (1881); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sugarland*, 420 A.2d at 150; *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162 (Del. 1989); *Maurer*, 95 A.2d 827).

The *Goodrich* decision involved a settlement of up to $3.3 million and an attorneys' fee award of up to $515,000, depending on the amount paid to the claimants. In *Americas Mining Corp. v. Theriault*, we addressed for the first time what our Court described as a "megafund" case.[85] The derivative plaintiff claimed that Americas Mining Corporation, a subsidiary of Southern Copper Corporation's controlling shareholder and its affiliate directors breached their fiduciary duty of loyalty to Southern Copper and its minority stockholders by causing Southern Copper to acquire the controller's 99.15% interest in a Mexican mining company at an unfair price. After a trial applying entire fairness review, the Court of Chancery entered judgment for the minority shareholder. It awarded more than $2 billion in damages.[86] The damage award was the largest recovery in the history of the Court of Chancery. The plaintiff's counsel requested 22.5% of the recovery for attorneys' fees and expenses. The court awarded a fee of 15% of the $2.03 billion judgment, or $304,742,604.45. Like the judgment, it was the largest fee award by the court.

On appeal, after affirming the damage award, we addressed the defendants' objections to the attorneys' fee award. The defendants argued, among other things,

---

[85] 51 A.3d at 1260. The question presented was "how to properly determine a reasonable percentage for a fee award in a megafund case." *Id.*

[86] *Id.* at 1252. The controller still retained 81% of the interest in the subsidiary it would pay the judgment to and would therefore, given the derivative nature of the action, indirectly benefit by their pro rata share of the judgment amount. *Id.* at 1263. Here, the Court of Chancery used this point as support for why the $1 billion settlement in the present case was so impressive. *Dell II*, 300 A.3d at 721.

that the Court of Chancery erred by not adopting a *per se* rule that the percentage of attorneys' fees awarded from the fund should decline as the fund amount increases.[87] We started the analysis by reiterating *Sugarland*'s central holdings. We reinforced the notion that "this Court rejected any mechanical approach to determining common fund fee awards."[88] And, like the *Goodrich* decision, "we explicitly disapproved the Third Circuit's 'lodestar method.'"[89]

Further, in discussing *Sugarland* and *Goodrich*, we held that the Supreme Court "did not adopt an inflexible percentage of the fund approach."[90] Instead, we reaffirmed that the court should consider the five *Sugarland* factors when making an equitable award of attorneys' fees.[91] We also noted that, when applying the *Sugarland* factors, "Delaware courts have assigned the greatest weight to the benefit achieved in litigation."[92] When assessing this factor, we affirmed the Court of Chancery's determination that the plaintiffs' attorneys "were entitled to a fair percentage of the benefit" achieved for the company and its stockholders in the derivative litigation.[93]

---

[87] *Ams. Mining*, 51 A.3d at 1258.

[88] *Id.* at 1254.

[89] *Id.*

[90] *Id.* (quoting *Sugarland*, 420 A.2d at 149–50).

[91] *Ams. Mining*, 51 A.3d at 1261.

[92] *Id.* at 1254.

[93] *Id.* at 1258 (emphasis omitted).

Next, the Court reviewed how the Court of Chancery applied each of the *Sugarland* factors. In setting the percentage of fee award from the judgment, we observed that, in Delaware, 33% is the upper range for attorneys' fees.[94] When a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred. If, however, a case settles after meaningful litigation, the range is typically 15–25%.[95] We also noted at the time that, in the federal setting, once a recovery exceeds $500 million, the median attorneys' fees fall to 11% from the typical range of 22–30% in routine actions.[96]

The defendants in *Americas Mining* argued that, after *Goodrich*, we required the Court of Chancery to employ a declining percentage to the fee award request in a megafund case. We disagreed, and rejected "[a] mechanical, *per se* application of the 'megafund rule,'" which would be out of step with the trend in federal court decisions.[97] We followed the federal trend and stated that a declining percentage could be applied in a megafund case as a matter of discretion:

> In *Goodrich*, we discussed the declining percentage of the fund concept, noting that the Court of Chancery rightly "acknowledged the merit of the emerging judicial consensus that the percentage of recovery

---

[94] *Id.* at 1259.

[95] *Id.* at 1260.

[96] *Id.* (citing Dr. Renzo Comolli et al., *Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review*, NERA Econ. Consulting, July 2012, at p.31).

[97] *Id.* (quoting *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 753–54 (S.D. Tex. 2008)); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302–03 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund.").

awarded should 'decrease as the size of the [common] fund increases.'" We also emphasized, however, that the multiple factor *Sugarland* approach to determining attorneys' fee awards remained adequate for purposes of applying the equitable common fund doctrine. Therefore, the use of a declining percentage, in applying the *Sugarland* factors in common fund cases, is a matter of discretion and is not required *per se*.[98]

In *Americas Mining*, we also noted that "the record does not support the Defendants' argument that the Court of Chancery failed to apply a 'declining percentage.'"[99] Instead, we concluded that: "the Court of Chancery reduced the award . . . based, at least in part, on its consideration of the Defendants' argument that the percentage should be smaller in light of the size of the judgment."[100] In other words, "the record reflect[ed] that the Court of Chancery did reduce the percentage it awarded due to the large amount of the judgment. The Defendants are really arguing that the Fee Award percentage did not 'decline' enough."[101]

Thus, in *Americas Mining*, we "decline[d] to impose either a cap or the mandatory use of any particular range of percentages for determining attorneys' fees in megafund cases" and "reaffirm[ed] that our holding in *Sugarland* sets forth the

---

[98] *Ams. Mining*, 51 A.3d at 1258.

[99] *Id.*

[100] *Id.* at 1258–59.

[101] *Id.* As noted earlier, the Court of Chancery in *Americas Mining* ruled: "Now, I gave a percentage of only 15 percent rather than 20 percent, 22 1/2 percent, or even 33 percent because the amount that's requested is large. I did take that into account. *Maybe I am embracing what is a declining thing.* I've tried to take into account all the factors, the delay, what was at stake, and what was reasonable. And I gave defendants credit for their arguments by going down to 15 percent." *Id.* (quoting trial court ruling).

27

proper factors for determining attorneys' fee awards in all common fund cases."[102]

After *Americas Mining*, the Court of Chancery has the discretion to apply a declining percentage based on the size of the award. We also approved its use in the only megafund fee award challenged in this Court.

## III.

## A.

The Court of Chancery refused to apply a declining percentage to the fee awarded in this case. According to the court, applying a declining percentage "runs counter to *Americas Mining* and the incentive structure that the Delaware Supreme Court created."[103] It also held that, after *Americas Mining*, "a court can reduce an excessive fee, but that analysis happens using the *Sugarland* factors" and not by applying a declining percentage to the fee award.[104]

Pentwater argues that, after *Americas Mining*, the Court of Chancery should have applied a declining percentage in this case.[105] In *Americas Mining*, the Court of Chancery recognized that it was, at least in part, applying a declining percentage in a megafund case when it arrived at a 15% fee.[106] On appeal, our Court also

---

[102] *Ams. Mining*, 51 A.3d at 1261.

[103] *Dell II,* 300 A.3d at 687.

[104] *Id.*

[105] Appellant's Second Corrected Opening Br. at 23, *Dell II* [hereinafter "Opening Br."].

[106] 51 A.3d at 1259, 1262.

28

recognized that the Court of Chancery had done so and affirmed the court when it reduced the percentage based, at least in part, on the size of the recovery.[107]

But Pentwater fails to confront another essential holding of *Americas Mining* that the Court of Chancery relied on in this case. Consistent with the cases preceding it, in *Americas Mining* we refused to adopt rigid rules in fee award cases.[108] We agree with the Court of Chancery in the present case that, after *Americas Mining*, the *Sugarland* factors control a megafund fee award, rather than any *per se* rule, whether declining percentage or any other rule. After *Americas Mining*, we follow the consensus in the federal courts that it is within the discretion of the court to reduce a fee percentage to account for the size of the award.[109] On appeal, this Court will not usually disturb the Court of Chancery's ruling if the court adequately explains

---

[107] *See Ams. Mining*, 51 A.3d at 1262.

[108] 51 A.3d at 1261 ("As we stated in *Goodrich*, '[n]ew mechanical guidelines are neither appropriate nor needed for the Court of Chancery.'" (quoting *Goodrich*, 681 A.2d at 1049)).

[109] *Ams. Mining*, 51 A.3d at 1261 ("The Third Circuit reasoned that it has 'generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees,' and that 'the declining percentage concept does not trump the fact-intensive [*In re*] *Prudential* [*Ins. Co. Am. Sales Litigation*, 148 F.3d 283 (3d Cir. 1998)]/*Gunter* [*v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) ] [factors,]' which are similar to this Court's *Sugarland* factors." (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302–03 (3d Cir. 2005))). The *Prudential*/*Gunter* factors include: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter*, 223 F.3d at 195 n.1.

its reasons and properly exercises its discretion when it applies the *Sugarland* factors.

We note that it is not inconsistent with the incentive structure in *Americas Mining* for the court to decrease the percentage of fees in a megafund case. As explained earlier, in *Americas Mining*, the Court of Chancery awarded 15% of the recovery following trial rather than a higher percentage based, at least in part, on the size of the recovery.[110] Given the equitable principles underpinning fee awards in common fund cases, and this Court's concern for excessive compensation or windfalls, it is entirely appropriate, and indeed essential, for the court to consider the size of the award in a megafund case when deciding the fee percentage.[111] An award can be so large that typical yardsticks, like stage of the case percentages, must yield to the greater policy concern of preventing windfalls to counsel.[112]

---

[110] *Ams. Mining*, 51 A.3d at 158–59 ("In exercising its discretion and explaining the basis for the Fee Award, the Court of Chancery reduced the award from the 22.5% requested by the Plaintiff to 15% based, at least in part, on its consideration of the Defendants' argument that the percentage should be smaller in light of the size of the judgment . . . .").

[111] *See, e.g.*, *Sugarland*, 420 A.2d at 150–51 (discussing the risk of windfall when granting a fee award); *Goodrich*, 681 A.2d at 1046 ("The equitable nature of awarding attorney's fees from a common fund requires a court to exercise broad discretion by applying a reasonableness standard."); *see also Dann v. Chrysler Corp.*, 215 A.2d 709, 716 (Del. Ch. 1965), *aff'd*, 223 A.2d 384 (Del. 1966).

[112] This Court and the Court of Chancery have had limited opportunities to consider the declining percentage approach. As the court here pointed out, only two judgments or settlements have ever exceeded $500 million – *Ams. Mining* and the present one – and only a handful of settlements have exceeded $100 million. *See Dell II*, 300 A.3d at 711–13 (listing only two settlements post-*Trulia*, including the present one, that exceed $100 million). In *Americas Mining*, the only such fee award considered on appeal, this Court approved the use of the declining percentage given the size of the recovery.

Windfalls are a particular concern in megafund cases. As lawyers and judges, we understand that representative litigation performs a valuable service to stockholders who individually might not have the resources or the will to pursue fiduciaries for breach of their duties. The potential for large fees incentivizes counsel to accept challenging cases. They assume the risk of recovering nothing in the end. In Delaware, we are used to big numbers.

But it is also legitimate to ask, outside our somewhat insular legal universe, whether the public would ever believe that lawyers must be awarded many hundreds of millions of dollars in any given case to motivate them to pursue representative litigation or to discourage counsel from settling cases for less than they are worth. At some point, the percentage of fees awarded in a megafund case exceed their value as an incentive to take representative cases and turn into a windfall. The Court of Chancery in *Seinfeld v. Coker* aptly described the competing policy concerns the court must balance when it arrives at a reasonable percentage in any case:

> This Court has proceeded in the past on the unstated premise that awarding large fees will necessarily produce the incentives of encouraging meritorious suits and encouraging efficient litigation. But a point exists at which these incentives are produced, and anything above that point is a windfall. In other words, if a fee of $500,000 produces these incentives in a particular case, awarding $1 million is a windfall, serving no other purpose than to siphon money away from stockholders and into the hands of their agents. Thus, it is important that we attempt, in a self-conscious and transparent manner, to estimate the point at which proper incentives are produced in a particular case. If one can at least approximate this point, one can in theory award fees in an amount that produces appropriate incentives without a significant

31

risk of producing socially unwholesome windfalls. That point likely will be different in every case, based in large part on the difference in risks among and within cases. As a result, this process is necessarily fact-specific and case-specific.[113]

Here, the Court of Chancery awarded 26.67% of the common fund.[114] The court acknowledged that, under *Americas Mining*, it had the discretion to reduce the percentage.[115] But it also found that "none of the reasons for a mega-fund reduction apply to this case."[116] According to the court, "[t]he risk of a non-recovery in this case (at trial or on appeal) was significant, and the risk intensified as trial approached."[117] The court also decided that "the recovery of $1 billion does not seem to have been the product of deal size."[118] There was no windfall to plaintiff's counsel, the court held, given the all the circumstances of the case.[119] We agree with the court's observations that it was a highly contentious litigation, spanning two and a half years, with nearly 100 lawyers entering appearance for the defense.[120] The

---

[113] 847 A.2d 330, 334 (Del. Ch. 2000) (footnotes omitted).

[114] *Dell II*, 300 A.3d at 730.

[115] *Id.* at 701.

[116] *Id.* at 715.

[117] *Id.*

[118] *Id.*

[119] *Id.* ("Reducing the requested award is not necessary from a compensatory perspective, because the implied rate of approximately $5,000 per hour is lower than rates this court has approved for smaller recoveries. . . . The multiple to lodestar of 7x in this case would not raise a federal eyebrow.").

[120] *Id.* at 727 ("[P]laintiff's counsel propounded sixty-six document requests, 710 interrogatories, and 179 requests for admission to the defendants. Plaintiff's counsel also served forty-one non-party subpoenas. Through these efforts, plaintiff's counsel developed an extensive record that

underlying transaction was complex, and counsel achieved an excellent settlement for the class on the eve of trial.[121]

The Court of Chancery supported the reasons for its fee award percentage, including the reasons for no downward adjustment to the fee percentage. We review its determination to decide whether it exceeded its discretion. We conclude in this case that the court acted within its discretion in awarding 26.67% of the common fund.

B.

Pentwater also argues on appeal that the Court of Chancery misapplied two of the *Sugarland* factors.[122] Under the first *Sugarland* factor, the results achieved, Pentwater claims that the benefit was limited because the settlement was only a tenth of what plaintiff's counsel sought before trial.[123] This argument, however, would have been better lodged by way of an objection to the adequacy of the settlement and not to the fee award. The class – which included sophisticated major Dell

---

included nearly 2.9 million pages of documents from over forty parties and non-parties. Plaintiff's counsel took thirty-two fact depositions, four of which lasted two days. Plaintiff's counsel also responded to the defendants' expansive discovery demands.).

[121] *Id.* at 728 ("Plaintiff's counsel had to work with their expert to develop novel valuation approaches for a transaction involving a one-of-a-kind tracking stock (DVMT), another complex security (VMware common stock), and a privately held company (Dell). Plaintiff's counsel also had to analyze complicated tax issues, alternative transactions like a forced conversion, and novel questions about market expectations and minority discounts.").

[122] Opening Br. at 17, 21. Pentwater did not challenge the other *Sugarland* factors.

[123] *Id.* at 20–21.

33

Technologies' stockholders – received notice, and no one objected to the adequacy of the settlement. The court, experienced with entire fairness review litigation, determined that the common fund reflected an "exceptional result" of approximately 5% of equity value and that "the settlement consideration of $1 billion represents a substantial fraction of the likely recoverable damages."[124] According to the court, when compared to the risk-adjusted value of the case, the settlement was adequate. The court did not exceed its discretion by holding that the benefit was significant under the first *Sugarland* factor.

Pentwater also claims that "when assessing the 'benefit achieved' the value of the settlement to the class members should be considered on a net basis."[125] Pentwater argues that, for a gross basis settlement, defendants rarely have a reason to dispute the plaintiff's fee application. Their exposure is capped at the gross settlement amount.[126] As a result, it argues, attorneys' fees are not subject to adversarial testing because the court typically has a limited record to evaluate the *Sugarland* factors.

In *Goodrich*, however, we recognized that "'there is often no one to argue for the interests of the class,' because class members with small claims often do not file

---

[124] *Dell II*, 300 A.3d at 723 (quoting Dkt. 536 at 41).

[125] Opening Br. at 17 (citing A380).

[126] Opening Br. at 18.

objections to proposed settlements and fee applications."[127]  As a result, the Court of

Chancery has an independent obligation to evaluate fee applications – a task subject

to "heightened judicial scrutiny."[128]  The rigorous review takes place irrespective of

whether any stockholder class member has asked to be heard, as Pentwater has done

here.  While a court may benefit from adversarial briefing on a fee application, such

briefing is not required for the Court of Chancery to faithfully carry out its duty to

class members to ensure a fair settlement.

The Court of Chancery observed that the court and this Court describe fee

awards as a "percentage of a gross common fund."[129]  And a "common fund with a

fee paid separately is mathematically equivalent to a larger common fund with a

lower percentage fee coming out of the gross amount."[130]  We agree with the Court

of Chancery that, in Delaware, attorneys' fees are typically awarded as a percentage

---

[127] *Goodrich*, 681 A.2d at 1045 (citing *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)).

[128] *Id.* at 1045–46.

[129] *Dell II*, 300 A.3d at 728.

[130] *Id* at 729.  In the Court of Chancery, the objectors relied on a decision where the fee was negotiated separately from the settlement amount.  *See In re Jefferies Grp., Inc. S'holders Litig.*, 2015 WL 3540662, at *4 (Del. Ch. June 5, 2015).  That decision ultimately considered whether to approve the fee based on its percentage of the gross value.  *Id.*  ("Taking into account each of the *Sugarland* factors, and placing the greatest weight on the settlement fund that was created as a result of the settlement, in my judgment the appropriate award for this case is $21.5 million, inclusive of expenses. This equates to approximately 23.5% of the gross value (approximately $91.5 million) of the settlement.").

of the gross benefit. Delaware law does not require that the fees be calculated on a net basis.

Under the second *Sugarland* factor, the time and effort of counsel, Pentwater contends that the Court of Chancery did not properly cross-check the time and effort of counsel against the size of the award.[131] According to Pentwater, the implied rate of counsels' time is at the high end of Delaware fee awards, meaning it signals a windfall to counsel. The court determined, however, that "the implied rate of approximately $5,000 per hour is lower than rates this court has approved for smaller recoveries" and "[t]he multiple to lodestar of 7x . . . would not raise a federal eyebrow."[132] While the amount is at the high end, it is not so unusual that we are required to undo the court's thorough consideration of all the *Sugarland* factors.

## C.

Finally, the Court of Chancery found that there was a "particular irony in who is arguing for [the declining percentage] method" when "as fund managers, the objectors do not use similar arrangements."[133] According to the court, "[t]he objectors do, however, engage in litigation, yet they declined to do so in this case."[134]

---

[131] Opening Br. at 21.

[132] *Dell II*, 300 A.3d at 715 & n.26 (citing federal cases greatly exceeding a 7x multiplier).

[133] *Id.* at 718.

[134] *Id.*

In the court's words, their objections "come with ill grace."[135]  Pentwater contends

that its business practices are irrelevant to the Court of Chancery's task of closely

scrutinizing fee awards based on the *Sugarland* factors.[136]  To allow otherwise,

Pentwater asserts, penalizes objectors for lodging objections and discourages

objections in future cases by sophisticated parties.

We have already decided that the Court of Chancery more than adequately

justified its fee award.  Thus, the court's decision to inquire into a class member's

business practices, does not affect our decision to affirm the court's judgment.  We

do, however, question the utility of singling out objectors for their business practices.

The objectors suffered the same type of financial injury as other members of the

class.  Upon receiving notice, Pentwater and the other objectors were told that they

could lodge objections.  They did not make unreasonable or frivolous arguments.

And although it might sound quaint, lawyers are not in the same position as

investment bankers and fund managers when it comes to class action settlements –

they are fiduciaries for the class.[137]  In our view, the court should not deter

---

[135] *Id.*

[136] Opening Br. at 30.

[137] *In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1174 n.34 (Del. Ch. 2002) ("By asserting a representative role on behalf of a proposed class, representative plaintiffs and their counsel voluntarily accept a fiduciary obligation towards members of the putative class." (citing Fed. Jud. Ctr., *Manual for Complex Litigation* § 30 at 31–32 (3d ed.1995)); Del. Lawyers' R. Prof'l Conduct 1.5(a) ("A lawyer shall not make an agreement for, charge, or collect an unreasonable fee . . . .").

meritorious objections from stockholders who have been harmed by subjecting their business practices to scrutiny as part of fee award proceedings.[138]  Their non-frivolous objections, when appropriate, act as another check on the reasonableness of the fees sought by counsel from a common fund.

IV.

The judgment of the Court of Chancery is affirmed.

---

[138] *Goodrich*, 681 A.2d at 1045 ("This divergence of interests requires a court to continue its 'third-party' role in reviewing common fund fee applications. '[T]here is often no one to argue for the interests of the class,' because class members with small claims often do not file objections to proposed settlements and fee applications." (quoting *Rawlings v. Prudential–Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993))).